STATE OF MISSISSIPPI EX REL. MYRON S. McNEIL, DISTRICT ATTORNEY v. GEORGE R. EDWARDS, STATE TREASURER, ET AL.

[46 South. 964.]

CONSTITUTIONAL LAW. *State depositaries. Laws* 1908, *ch.* 96, *p.* 77. *Constitution* 1890, *sec.* 137. *Published statements of condition of treasury.*

> Laws 1908, ch. 96, p. 77, providing for state depositories and requiring the state treasurer to keep the state's moneys on deposit in the banks selected as depositories is constitutional; it does not violate Constitution 1890, sec. 137, requiring the state treasurer to publish semi-annual statements showing the condition of the treasury and the balance on hand, with a certificate of the governor as to their correctness.

FROM the chancery court, first district, Hinds county.

HON. G. GARLAND LYELL, Chancellor.

The state of Mississippi, suing on the relation of the district attorney, appellant, was complainant in the court below; Edwards, state treasurer, and others, appellees, were defendants there. The object of the suit was to enjoin the defendants, state officers, from carrying into effect the provisions of the act, Laws 1908, ch. 96, p. 77, providing for state depositories. The court below dissolved the preliminary injunction which had been obtained and the complainant appealed to the supreme court. The facts are stated in the opinion of the court.

*Myron S. McNeil,* district attorney, for appellant.

Is the act constitutional? I maintain it is not. The pole star for constitutional interpretation and construction is the intent of the people in adopting it . Cooley Con. Lim. 89.

The people in forming the constitution committed to the legislature the whole law making power of the state which they did not expressly or impliedly withhold. Cooley Con. Lim. 99, 127, 240, 242.

And to ascertain this legislative intent we are to examine the state of things existing when the constitution was adopted, to ascertain the old law, the mischief and the remedy. Cooley Con. Lim. 100.

What was the old law—the constitutional provision? All prior constitutions of the state had been silent on the subject. What was the condition of things? $315,000 of the state's money lost and suits then pending for its recovery. How lost? By being in some way suffered and permitted to leave the vaults of the treasury, and no one thought the treasurer himself had squandered the money for his personal use. The remedy? To require the money at all times to be "in the treasury." "Actually in the vaults of the treasury."

It is conceded that this section of the constitution was framed in view of the known habit or custom of the state to keep its money in the vaults of the state treasury. In fact it is admitted that the convention contemplated that the money should at all times be actually in the vaults of the treasury. This admits the case. It is a well recognized canon of constitutional construction, that it matters not what terms are employed. When the intent is made out it must govern. And if at the time the constitution was adopted there were known and settled rules and usages or other laws of the country, in reference to which the constitution has evidently been formed, these in effect became a part of the constitution itself.

It matters not whether it be common law, custom or statutory provisions. Cooley Con. Lim. 100, 186; Lewis v. Beatty, 32 Miss. 50; Beck v. Allen, 58 Miss. 177.

In the light of history and the prior state of the law it will not do to say, that this provision had no purpose other than to restrain and control the custodian himself. The purpose was to provide for the safety and prevent the loss of the public moneys. And to accomplish this purpose the sovereign deemed it wise to, and did, provide that the money should remain "in the vaults of the treasury" "actually in the vaults of the treasury,"

so long as the legislature said nothing to the contrary. If this, no constitutional provision was required, its regulation might well have been left to statutory enactment exclusively if, notwithstanding this expression of the sovereign, the treasurer when divested could farm out the public money. The sovereign has said to the treasurer that the moneys shall be kept in the treasury, and by the act, the legislature assumes to say that not-withstanding the constitution you keep the moneys thus and not-withstanding the fact that you are the custodian of the public moneys, we will make a way for the evasion of the supreme law, by letting out the money to certain banks, for which you shall take certain securities, and this shall to all intents and purposes be considered as money and when kept in the treasury, a compli-ance with the mandates of the constitution. The history of this act shows that notwithstanding an over-public sentiment for such a law, the legislature itself had grave doubt of its power— no matter how anxious it might be to yield to this demand to exact a law.

Suppose it had been suggested to the constitutional conven-tion that the depositories be provided for, does any one doubt for an instant, in view of the recent loss to the state and the scandal attendant, the lack of confidence in banks then existing, that for one moment it would have received favorable consider-ation?

Read this act as we may, it is simply a scheme for the loan-ing by the state treasurer of the public moneys—all of them, contrary to the clear and manifest provisions of the constitution.

Unless it be said that these banks shall constitute the "treas-ury" and evidence of indebtedness constitutes "funds" within the meaning of section 137, then the governor cannot comply with the constitutional mandate—and even then he cannot, for if the act is complied with, there will be no "balance stated by the treasurer actually in the vaults of the treasury" and an impossibility to "verify the cash balance as shown by the books"

and in all cases the cash balance as called for by the books, must necessarily be published as not actually in the treasury.

The act cannot be held constitutional without paring away the language and intent of section 137 and this should never be done.

Whether the opinion of Judge Campbell in the case of *Beck v. Allen,* 58 Miss. 177, is right or wrong as to the particular construction there involved, it is full of irrefutable logic, and if the rules of construction by him there laid down are to be followed, this act must be declared unconstitutional.

*R. V. Fletcher,* attorney general, for appellees.

This litigation was instituted for the purpose of testing the constitutionality of chapter 96, Laws 1908, known as the State Depository Law. Grave reasons of public policy demand that the constitutionality of this act should be judicially determined before the act is put into effect. There can be nothing in the act itself which is subject to attack on constitutional grounds, provided any act can be constitutional.

MAYES, J., delivered the opinion of the court.

The object of this suit is to test the constitutionality of chapter 96, Laws of 1908, providing for the removal of the state funds from the vaults of the treasury by the establishment of state depositories. By section 1 of the act it is provided that "the state treasurer shall deposit and at all times keep on deposit in the state or national bank, or some of them doing business in this state, the amount of money in his hands belonging to the several current funds in the state treasury, and any such banks may apply for the privilege of keeping on deposit such funds or some part thereof." For the purpose of deciding the question involved, this is the only part of the act we need quote, since it is by this section that the funds are authorized to be removed from the vaults of the treasury, and all other features of the act are addressed merely to the administration of the law.

It is claimed that this act violates section 137 of the constitution of the state, which is as follows, viz.: "It shall be the duty of the state treasurer, within ten days after the 1st day of January and July of each year, to publish a statement under oath, in some newspaper published at the seat of government, showing the condition of the treasury on said days, the balance on hand and in what funds, together with a certificate of the governor that he has verified the count of the funds in the treasury, and found the balance, stated by the treasurer, actually in the vaults of the treasury, or as the truth may be. And it shall be the duty of the governor, at such times as he may deem proper, to go to the treasury, without giving notice to the treasurer, and verify the cash balance as shown by the books, and to publish the fact that he has done so, and whether the amount called for by the books be actually in the treasury, and stating whether the treasurer had any notice whatever that the verification would be made." If the act in question is in conflict with the organic law of the state, it can only be in conflict with section 137, because that is the only provision of the constitution which deals with the question involved in this act.

All laws passed by the legislature of the state are presumably valid in any case, and the presumption is a conclusive one, unless there is to be found in the constitution of the United States or the constitution of the state a prohibition on the power of the legislature to pass the particular law. Under this act there can arise no question under the federal constitution. The act deals with a purely state matter. The legislature represents the sovereign power, and is vested with full control and disposition of the state's funds, except in such instances as the constitution prohibits. Thus by section 92 of the constitution the legislature is prohibited from making payment to any person of the salary of a deceased officer beyond the date of his death. By section 93 the legislature cannot retire any officer on pay, or part pay, or make any grant to such retiring officer. By section 96 the

legislature cannot grant extra compensation, fee, or allowance to any public officer, agent, servant, or contractor, after service rendered, etc. These are the only restrictions thrown around the sovereign power of the legislature to control and dispose of the funds of the state, and it is apparent that these restrictions are against private, and in favor of the public, interest. There is not to be found in the constitution any prohibition on the legislature to pass a depository law. Section 137 of the constitution was never intended to hamper or hinder the sovereign power from enacting laws for the regulation and control of the state funds for the best interest of the state. Its purpose was to control the treasurer in dealing with the funds as treasurer. When it was adopted, it was in view of the then unbroken custom of the state to keep its money in the vaults. Its object was to prevent the treasurer, either for profit or accommodation, from moving the funds committed to his care from the place where the law designated for the keeping of same. It had no purpose other than to restrain the custodian of the funds from making profit by loaning the state's money, or jeopardizing the funds by removing same from the treasury without authority, and any other construction is beyond the purpose of the constitutional section in question. The requirement of section 137 that the treasurer publish a statement under oath, etc., showing the condition of the treasury, etc., the balance on hand, etc., and that the governor make a certificate that he has verified the count of the funds in the treasury, and found the balance, stated by the treasurer, actually in the vaults of the treasury, presents no difficulty whatever, nor does it make doubtful the power of the legislature to pass a depository law. The books of the treasurer must show only such sums of money and other funds as must be there after making such disposition of the funds as the law requires, and due credit is to be given for all funds on deposit with the banks in obedience to the law, just as the treasurer is entitled to credit for any other lawful disbursement. The

amount required to be actually in the treasury is only such amount as is left after the treasurer has made lawful disposition of the funds.

The act in question is subject to many criticisms as applied to its practical administration. It is in many respects very imperfect, and the character of some of the security authorized to be taken by it is of a most unsatisfactory nature. In the acts of 1908 are to be found two depository laws. These laws are contained in chapters 96 and 97. Chapter 96 provides for the establishment of state depositories, and chapter 97 provides for the establishment of depositories for the levee district funds. By section 2 of the act in relation to the state depository the security authorized to be taken for the loan of the state's funds is required to be state bonds, levee bonds, county bonds, municipal bonds, United States bonds, or surety bonds of any surety company authorized to do business in the state of Mississippi. The act further provides that "no bonds shall be accepted as security if worth less than par in the market." By section 2 of the act two classes of security may be taken—that is, bonds of the state, levee bonds, etc., all of which have a market value; and, secondly, the surety bonds of any surety company authorized to do business in the state. In the nature of things, a mere surety bond has no market value. For this last character of security the state gets nothing but a mere right to sue on the bond, in case the depository using this character of security fail to pay over the money when required by the state to do so, and we apprehend that the state would experience much difficulty in realizing anything on the surety bond in open market. By section 11 it is provided that "in the event of the failure of any state depository to pay any warrant lawfully issued by the auditor of public accounts on any funds on deposit belonging to the state in such depository, the treasurer is hereby empowered to sell such securities as are not placed with him by such depository," etc. It is thus seen that all bonds taken as security are required to be worth their par in the market. Of

course, section 11 can have no application to security bonds, since the surety bond has no commercial value. We merely point out these features of the law to emphasize its crudities and uncertainties. The whole act shows that it was the intent and purpose of the legislature to require as security for the loan of the state's money a character of collateral readily convertible on the market, to the end that the state might not be embarrassed in collecting its funds, and yet the act authorizes one character of security which has no market value whatever and is but a mere right to sue. While section 11 provides for a sale of the bonds deposited as collateral, in order to realize on the security when necessary, nothing is said in the act about the method of realizing where the security is a surety bond. Of course it would follow necessarily that the state could sue on the bond; but it might take years to thus collect its funds, and we merely point out these things as emphasizing the many defects of the law. Where surety bonds are accepted as security, no form of bond is given by the statute which it is required that the surety company shall give; but the board authorized by law to supervise the loans are left to adopt their own form of bond. We hardly think that any banking institution would regard a surety company's bond as constituting any valuable security as the basis of a loan.

A comparison of the act creating the state depository with the act creating the levee depository shows that much more care was taken for the safety of the levee funds than for the state funds. Section 3 of the levee depository law only authorized the taking of United States bonds, state bonds, levee bonds, county bonds, and municipal bonds; the municipal and county bonds of a county or municipality located in the levee district. The act does not authorize the taking of the bonds of a surety company as collateral. Such bonds may be used as security additional to that authorized to be taken by the act; but even then two or more of the surety companies are required to sign the bond, when used to obtain a loan of the levee funds. No

funds of the levee may be loaned out on the security named in the act alone, but in every case an additional security bond is required to be signed by four or more individual securities or two or more surty companies authorized to do business in the state. The loan of the levee fund is still further secured by making all stockholders of a depository liable for any loss sustained on account of the failure of the depository, etc.

We are forced to approve this act, because it violates no constitutional provision of the state or United States; but in its present imperfect and unsatisfactory condition we reluctantly yield our assent to this conclusion. We might indulge in many other criticisms of the act in question; but the criticisms would only be of such features as must be corrected by the legislature and could serve no purpose here.

*Affirmed and bill dismissed.*

CALHOON, J., delivered the following concurring opinion.

The courts have always had such consideration for the legislature that they have uniformly declined to hold an enacted statute unconstitutional unless it was violative of the organic law, state or federal, beyond a reasonable doubt. It is universally recognized that a state legislature has all power not withheld from it expressly or by necessary implication. In this it differs, of course, from the federal congress, which has no power whatever except what is delegated to it expressly or by necessary implication.

Without section 137 of our state constitution, the legislative power to establish depositories of public moneys is unquestionable. In my opinion there is nothing in that section forbidding it in direct terms, or which is inconsistent with it. Manifestly, to my mind, this act cannot be considered as unconstitutional beyond reasonable doubt. Legislative action is presumably valid, and should be so held, unless it be plainly in conflict with some provision of the organic law. The act under consideration is not, in my view, so in conflict. Courts should not undertake

to set limits to legislative power without clear constitutional authority. If the organic law be not explicit, "it ought not to be so construed by the courts as to cripple the government," as has been said by this court, or to annul the acts of the immediate representatives of the peopl

WHITFIELD, C. J., delivered the following dissenting opinion.

Section 137 of the constitution is in the following words: "It shall be the duty of the state treasurer, within ten days after the 1st day of January and July of each year, to publish a statement under oath in some newspaper published at the seat of government, showing the condition of the treasury on said days, the balance on hand, and in what funds, together with a certificate of the governor that he has verified the count of the funds in the treasury, and found the balance stated by the treasurer actually in the vaults of the treasury, or as the truth may be. And it shall be the duty of the governor, at such other times as he may deem proper, to go to the treasury, without giving notice to the treasurer, and verify the cash balance as shown by the books, and to publish the fact that he has done so, and whether the amount called for by the books be actually in the treasury, and stating whether the treasurer had any notice whatever that the verification would be made."

I am clearly of the opinion that no state depositories of the kind indicated in the bill, or any like kind, can constitutionally be created. The language of section 137 is plain and explicit. It means just what it says, that the money or funds shall actually be in the treasury. The first part of section 137 provides that the state treasurer's published statement shall show "the balance on hand," which means on hand with him in the treasury, and that the governor shall give a certificate that he has verified the count of the funds "in the treasury," and "found the balance stated by the treasurer actually in the vaults of the treasury, or as the truth may be." The language "actually in the vaults of the treasury," is impossible of being misconstrued.

Language could not be selected more emphatically conclusive of the purpose of the constitution makers to have the money and funds of the state kept "actually in the vaults of the treasury." The phrase, "or as the truth may be," simply means that, if the funds or money are not there, the governor shall so state, and also state where they are, if he knows. The second part of the section provides that the governor, without notice to the treasurer, at such time as he may deem proper, shall go to the treasury and verify the cash balance, and publish the fact that he has done so, "and whether the amount called for by the books be actually in the treasury." Notice the words, twice used— in the first section, "actually in the vaults of the treasury;" and in the second part, "actually in the treasury." Is it possible that human language can make the purpose to have the money and funds actually kept in the treasury, plainer?

It is part also of the history of the time when this section of the constitution was adopted that the largest treasury defalcation known to the state was then recent, and doubtless inspired this very provision of the constitution. The form of section 137 of the constitution is identical with the form proposed by Mr. Yerger, chairman of the committee on executive department in the constitutional convention of 1890, as set out on pages 493, 494, of the official journal of the Mississippi constitutional convention of 1890. If a close and minute analysis is made of this section 137, it is demonstrated beyond any controversy that the legislature is without power to pass a depository law. By that section it is made the duty of the state treasurer, semi-annually, on the 1st day of January and July of each year, to publish a sworn statement showing "the condition of the treasury, the balance on hand, and in what funds." Balance of what? Why, manifestly, the balance left after deducting the credits that the treasurer is entitled to by reason of warrants paid out. It means that, and nothing else. What this balance on hand consists of is to be shown—in "what funds" says the section. In other words, the treasurer's statement is to show cash

on hand, and every fund on hand. Not only that, but this cash and these funds are to be on hand; that is to say, with the treasurer in the treasury vault. But, again, there is to accompany this sworn statement the certificate of the governor that he "has verified the count of the funds in the treasury, and found the balance stated by the treasurer actually in the vaults of the treasury, or as the truth may be." What, specifically, is the governor to do? First, to certify that "he has verified the count;" second, "of the funds in the treasury." The word "funds" here, of course, embraces everything in the treasury— money and all other funds. But, again, he is not only to verify the count of the funds, but the funds are to be in the treasury. These are the funds he counts, and he is directed to verify the count of the funds "in the treasury." These words, "in the treasury," ought to be enough to settle the controversy; but so emphatic was the admonition of the recent defalcation that the convention added and found the balance stated by the treasurer "actually in the vaults of the treasury." Here we have added, as if "to make assurance doubly sure and take a bond of fate," the words "actually in the vaults of the treasury."

Notice, specifically, the duplication of emphasis on the adverb "actually" and the words "in the vaults of the treasury." Those words were used, "actually in the vaults of the treasury," with the most sacred care and caution, for the very purpose of forever excluding any constructive presence in the treasury, or with the treasurer, of the funds of the state; in other words, for the purpose of excluding the very thing the majority of the court now holds the legislature may do. According to the majority opinion, the treasurer is simply to say to the governor when he goes to make the count of the funds in the treasury and to certify that those funds actually are in the vaults of the treasury: "Here are my books, and the balance shown by these books is partly in the treasury in cash or funds; but nearly all of it, both in cash and in funds, is not actually in the vaults of this treasury; but is constructively here. You will find it act-

ually in banks Nos. 1, 2, 3, 4, etc., scattered over the state. All you find here is the evidence those banks have given me that they have them, together with the securities, of whatever description, they have left with me as security for the funds I have thus deposited with them." Is it possible that any logical mind expects to satisfy the reason or the understanding by saying that these words, "funds in the treasury," or "funds actually in the vaults of the treasury," do not mean what they say, or mean constructively in the treasury? And yet that is actually what the majority opinion holds. It is so plain to my mind that the funds are to be, as said, "in the treasury," and that the governor is to verify the count of funds "actually in the vaults of the treasury," that I find it difficult to discuss the question. The majority opinion does not even mention these controlling words. They do not receive from my Brethern "the cold respect of a passing glance." How the committee, headed by its able chairman, and composed of the able men constituting it, men aware of what might happen and had recently happened, unless the funds were kept "actually in the vaults of the treasury," and men thoroughly masters of the English speech, could have, in any more studied and careful and emphatic manner, drawn the distinction between the actual presence in the vaults of the treasury, with the treasurer of the state's funds, and only the constructive presence of these funds there in the vaults of the treasury, and their actual presence in banks in which the treasurer might have deposited them, it is impossible to conceive.

But look again at the second paragraph of section 137. Turning from the duty of the treasurer, it is then declared that the governor shall, at such times, unknown to the treasurer, as he deems proper, go to the treasury and verify what? "The cash balance as shown by the books." What cash balance? Why the cash balance left with him after deducting, as said before, the credits to which the treasurer was entitled on warrants he had paid out. And to do what else? To publish the fact that he had so verified the cash balance; and, further (note this specially),

see "whether the amounts called for by the books be actually in the treasury." What fact was he now to state to the public under his duty as governor? That, without giving the treasurer notice, he had gone to the treasury and counted the cash balance, and that he had found the amount—that is to say, of money and of funds of whatever description—where? In some deposit banks? Not at all, but in the treasury. Here, then to repeat it, and dismiss it, are two emphatic declarations that the funds, meaning all the funds, are to be first "in the treasury;" and "actually in the vaults of the treasury;" and in the second paragraph, defining the duties of the governor, it is again said that he shall count the cash balance and publish the fact that the amounts (in the plural)—that is to say, of money and funds—were "in the treasury." Frankly I find it utterly impossible to apprehend how any other construction of this constitutional provision is logically possible to the reasoning mind.

Apply, now, the well-settled canon of constitutional construction, and see whether the majority opinion squares with it; and let me give that canon in the language of Judge Campbell, as taken from *Beck v. Allen*, 58 Miss. 177. He there said most wisely: "Subtlety and refinement and astuteness are not admissible to explain away the expression of the sovereign will. The framers of the constitution and the people who adopted it must be understood to have intended the words employed in that sense most likely to arise from them on first reading them." This is the doctrine approved by Cooley and Story, and all other constitutional writers. Let me ask, in the light of this canon of construction, this question: Take one hundred average citizens on the street, and submit section 137 to each of them, and require him to answer on the spot whether it does not require the funds to be actually in the treasury. Is there any doubt but that ninety of that one hundred, at least, would answer that the words "in the treasury" and "actually in the vaults of the treasury" settled that beyond controversy? And why would that an-

swer be made? Because that is what the words, taken in the sense that naturally arises from them on first reading them, would import to the average mind. My Brethren have written a very ingenious and refined opinion; but, with all deference to them, it looks to me much more like an effort to show what ought to be good public policy in respect to establishing depositories than what the meaning of section 137 is according to its plain terms. Now, the expediency and wisdom and public policy of establishing state depositories, is a matter with which the court has no concern. If it shall now be thought, at the present time, that the requirement of section 137, adopted in the light of the great defalcation referred to, is too hard and fast a rule, the remedy is by providing an amendment to that section of the constitution, so as to authorize state depositories, and to amend that section, in the mode the constitution provides for amendment, and not to override or violate that section by the passage of a legislative act in plain contravention of its spirit and terms.

I, therefore, speaking for myself alone, hold as follows: First, I am clearly of the opinion that "state depositories of the funds of the state" cannot be provided for by law, without violating section 137 of the constitution; and, second, as a corollary of this, I think the pretended statute is plainly violative of said section 137 of the constitution.