539 So.2d 1338 (1989)
Michael A. HALL
v.
STATE of Mississippi.
No. 57940.
Supreme Court of Mississippi.
February 9, 1989.
*1339 Minor F. Buchanan, Jackson, for appellant.
Mike Moore, Atty. Gen. by Pat Flynn, Sp. Asst. Atty. Gen., Jackson, for appellee.
EN BANC.
ROBERTSON, Justice, for the Court:

I.
Today's appeal implicates the grand form of our government. The making of *1340 rules of evidence to govern trials in our courts is a function at the core of the judicial power. We have exercised that power by adopting the Mississippi Rules of Evidence, effective January 1, 1986. While the ink was yet wet on the pages of our rules book, the legislature purported to change and enlarge upon the Rules of Evidence by enacting the Evidence of Child Sexual Abuse Act. The two clash here, as substantial hearsay evidence presented in prosecution of this child sexual battery case has been held admissible under the statute, although excludable under the rules.
The legislature has enacted upon a matter at the core of the judicial power. In such circumstances the statute should not be enforced. The integrity of the judicial department of the government of this state demands no less.

II.

A.
Michael A. Hall, thirty-six years of age at the time of trial in July of 1986, was married to Sue Ann Strong Hall in 1971. The Halls had two children: Keith, born March 3, 1974, and Chad, born June 2, 1979. Hall and his wife were divorced in February of 1981 and Sue Ann Hall was given custody of the children.
In September, 1983, Sue Ann, by agreement, allowed the boys to go and live with their father, who at the time was living in a trailer in Edwards, Mississippi. Shortly thereafter, Hall moved to Vicksburg taking the boys with him. The next several years saw little stability in the lives of the two boys as they bounced back and forth between Hall and his ex-wife, between Warren and Hinds Counties.
At some time in 1983 the Hinds County Department of Public Welfare received a complaint that Chad was an abused child. In April of 1985, Debbie Graham, a social worker of the Hinds County DPW received a complaint that Chad was being sexually abused by his father. Shortly thereafter, Graham obtained an order from the Youth Court of Hinds County that Keith and Chad be removed from Hall's custody, and they were taken to Christians In Action Center, a children's emergency shelter.
At the shelter the children were interviewed by Brenda Chance, a social worker specializing in children's therapy. Chad was also physically examined by Dr. Julia Sherwood, a pediatrician. Collectively, the findings of Graham, Chance and Dr. Sherwood suggested that Hall was engaged in a continuous course of sexual abuse of his then five-year-old son.

B.
These proceedings were commenced on October 29, 1985, when the Grand Jury of the Second Judicial District of Hinds County, Mississippi, formally charged Michael A. Hall with sexual battery upon his son, Chad. See Miss. Code Ann. § 97-3-95 (1985). The indictment specifically charged that between August 1, 1984, and September 30, 1984  later amended to November 15, 1984  Hall feloniously engaged in the sexual battery by penetrating Chad's anal opening with his penis.
On July 10, 1986, the prosecution sought to clear the way for use at trial of hearsay versions of Chad's complaints against his father, moving for an order declaring Chad "unavailable" as a witness, and citing the provisions of the recently enacted Evidence of Child Sexual Abuse Act, Miss. Laws, ch. 345 (1986), codified as Miss. Code Ann. §§ 13-1-401, et seq. (Supp. 1988). The motion recited that there was a substantial likelihood that Chad would experience traumatic or emotional distress if he were required to testify against his father in open court. Chad was examined and evaluated by Dr. Charleton E. Stanley, Ph.D., a psychologist, and by Kimberly Lee McAlister, a psychology technician, each of whom testified in support of the prosecution's motion. Prior to trial the court held that Chad was unavailable. Miss. Code Ann. § 13-1-403(1)(c)(ii) (Supp. 1988). The net effect *1341 of this ruling, if the statute be enforceable, was that out-of-court statements Chad had made to Graham and Chance would be admissible as evidence supporting the charge laid in the indictment.
The case was called for trial on July 21, 1986. The prosecution first presented evidence through Keith, Chad's ten-year-old brother, that Hall had indeed sexually abused Chad. Graham and Chance were called, each of whom reported to the jury conversations had with Chad. The essence of these conversations was statements by Chad describing a course of sexual acts his father performed on him. Beyond this hearsay evidence, Graham and Chance were each allowed to give an opinion that Chad was telling the truth when he said Hall had sexually abused him. Chance was also allowed to give an opinion that Chad exhibited behavior characteristic of a sexually abused child.[1]
The defense consisted primarily of Hall's denials of any improper or illegal sexual acts toward Chad. The defense called Dr. Daniel Cox, a psychologist, who questioned the credibility of the opinions offered by the prosecution experts.
At the conclusion of all of the evidence, the jury returned a verdict that Hall was guilty of sexual battery as charged in the indictment. The Circuit Court sentenced Hall to a term of twenty-five years imprisonment in the custody of the Mississippi Department of Corrections. Following denial of the usual post-trial motions, Hall perfected his appeal to this Court and presents a veritable plethora of assignments of error.

III.

A.
Our outcome determinative question concerns the admissibility of the extensive testimony of the two social workers, Debbie Graham[2] and Brenda Chance,[3] of statements Chad made to them. Eschewing the child's graphics, Graham and Chance had Chad describing the ways in which his father had sexually abused him. Each of these statements is garden variety hearsay. Each is a statement made by another, Chad, to the respective witnesses, Graham and Chance, offered by the prosecution to convince the jury that Hall did to Chad what Chad said he did. See Rule 801(c), Miss.R.Ev.

B.
We first consider our Rules of Evidence, for if the testimony at issue is there found admissible our inquiry is at an end, subject only to Hall's Confrontation Clause challenge.[4] As we have said, what Chad told Graham and Chance, when relayed to the jury by Graham and Chance, is hearsay. "Hearsay is not admissible except as provided by law." Rule 802, Miss.R.Ev. [Emphasis supplied] We search for a valid law under which such hearsay may be admitted.
Rule 803, Miss.R.Ev., itemizes twenty-three specific exceptions to the hearsay rule. Evidence falling within one of these exceptions is admissible, notwithstanding that it be hearsay or that the *1342 declarant, Chad, be available to be called as a witness. Each of the statements Chad is said to have made to Graham or Chance described events said to have occurred weeks, if not months, earlier. The prosecution gains no profit from the excited utterance exception, Rule 803(2), Miss.R.Ev.,[5] nor do we have a statement of Chad's then existing state of mind, for these are "statement[s] of memory or belief to prove ... fact[s] remembered ..." Rule 803(3), Miss. R.Ev.[6] Nor are these statements made for purposes of medical diagnosis or treatment. Rule 803(4), Miss.R.Ev.[7] Without doubt, Graham and Chance sought to aid and counsel Chad, but neither are they physicians nor may the services they rendered be stretched into the world of the medical.[8]See Cassidy v. State, 74 Md. App. 1, 536 A.2d 666, 678-89 (1988); contrast State Farm Mutual Automobile Insurance Co. v. Gregg, 526 So.2d 554, 557-58 (Miss. 1988). No other specific exception within Rule 803 is remotely applicable.
Rule 803(24), Miss.R.Ev., furnishes a dynamic catchall. Hearsay not covered under any of the Rule's twenty-three specific exceptions may be admitted if it has "equivalent circumstantial guarantees of trustworthiness" and if certain other procedural requisites are met.[9]See Cummins v. State, 515 So.2d 869, 873 (Miss. 1987). The record before us fails to reflect any *1343 "trustworthiness" finding by the Circuit Court, nor are we prepared to imply one. Moreover, neither we nor the Circuit Court have been presented argument that the statements Chad made to Graham and Chance are "more probative" than "any other evidence which the proponent can procure through reasonable efforts," See Rule 803(24)(B). Today's hearsay fails under Rule 803(24), but in so saying we are not saying similar evidence may never be received under this catchall hearsay exception, only that the proponent must satisfy the trial court that each of the requisites of the rule is met. See Cummins v. State, 515 So.2d at 873; State v. Smith, 315 N.C. 76, 90-98, 337 S.E.2d 833, 843-48 (1985). As we must review such matters, the trial court should preserve for the record its findings on each point suggested by the rule. Cf. Peterson v. State, 518 So.2d 632, 636 (Miss. 1987).
Rule 804 provides further exceptions to the hearsay rule. These are available to a party only where the declarant is unavailable as a witness. Chad, of course, was physically present within the jurisdiction. He simply was not called. Rule 804(a) legally defines "unavailability as a witness."[10] We have considered carefully each of the five circumstances of "unavailability" provided in Rule 804 and find it inescapable that within the rule Chad was "available". The prosecution finds no aid or comfort in Rule 804's additional hearsay exceptions.

C.
These things said, we can but conclude that nothing in the Mississippi Rules of Evidence affords legal undergirding for Graham and Chance to tell the jury what Chad said. The State argues, however, that the Rules of Evidence are not the only form of law which may supply the rule it seeks. The State points to the Evidence of Child Sexual Abuse Act, Miss. Code Ann. *1344 §§ 13-1-401, et seq. (Supp. 1988), effective July 1, 1986  some three weeks before trial. Section 13-1-403[11] of that statutory enactment does indeed appear to suggest admissibility. That section defines "unavailability" quite otherwise than Rule 804(a), providing that a child such as Chad is "unavailable" if "the child's participation in the trial would result in a substantial likelihood of traumatic emotional or mental distress." The record reflects expert testimony that, if required to testify in court against his father, Chad would likely experience such an adverse effect.
When Rule 802 declares that hearsay is not admissible "except as provided by law," it means "except as provided by valid law." Law is valid only when it emanates from a source having authority to make it. Jones By Jones v. Harris, 460 So.2d 120, 124 (Miss. 1984) (Robertson, J., concurring). Our question then is whether the legislature had authority to confer legal validity upon the Evidence of Child Sexual Abuse Act.[12] The question brings us face to face with whether the act invades the constitutionally grounded rule-making authority of this Court and is thus void.

D.
The rules and standards by which evidence is adjudged competent for use in a trial are the concern of the department of government where trials take place: the judicial department. The authority to act upon that concern is similarly situated. That authority has become known as the rule-making power. However problematic the point may once have been,[13] the rule-making *1345 power has become established as a permanent part of the authority of the Supreme Court of Mississippi. Still, it is helpful to reflect upon whence we have come.
Twenty years ago Chief Justice W.N. Ethridge, Jr., speaking for the Court in Southern Pacific Lumber Co. v. Reynolds, 206 So.2d 334, 335 (Miss. 1968), wrote:
The phrase "judicial power" in Section 144 of the Constitution includes the power to make rules of practice and procedure, not inconsistent with the constitution, for the efficient disposition of judicial business.
Southern Pacific's more famous offspring, Newell v. State, 308 So.2d 71, 76 (Miss. 1975), trumpeted:
The inherent power of this Court to promulgate procedural rules emanates from the fundamental constitutional concept of the separation of powers and the vesting of judicial powers in the courts.
In those early post-Newell days, this Court exercised its rule-making power in addressing specific or isolated problems of procedure and practice. See Haralson v. State, 308 So.2d 222 (Miss. 1975) (holding invalid a statute requiring ten days notice to a court reporter in order to perfect an appeal); Scott v. State, 310 So.2d 703 (Miss. 1975) (upholding rule requiring pre-filing of proposed jury instructions); Jackson v. State, 337 So.2d 1242, 1253-57 (Miss. 1976) ("amending" statutory procedure for sentencing phase of capital murder trials).
On May 26, 1981, we crossed the Rubicon as the Court entered its Order Adopting the Mississippi Rules of Civil Procedure. Since that time judicial rule making has proceeded at a dizzying pace. Best known are the two further sets of rules largely patterned after comparable federal rules: the Mississippi Rules of Evidence and, most recently, the Mississippi Supreme Court Rules. Lesser known, but quite significant and equally a product of this Court's rule-making power, are the Uniform Circuit Court Rules, the Uniform Criminal Rules of Circuit Court Practice, the Uniform Chancery Court Rules,[14] the Uniform County Court Rules and the Uniform Criminal Rules of County Court Practice.
What is important to remember is that this Court's rulemaking power is a function of our constitution's command that the three great governmental powers be separate. Miss. Const. Art. I, §§ 1 and 2 (1890). Glenn v. Herring, 415 So.2d 695, 696 (Miss. 1982); Newell v. State, 308 So.2d at 76; Matthews v. State, 288 So.2d 714, 715 (Miss. 1974). At its heart that doctrine of separation of powers provides that no officer of one department of government may exercise a power at the core of the power constitutionally committed to one of the other departments. Alexander v. State By and Through Allain, 441 So.2d 1329, 1345, 1346 (Miss. 1983).
The powers vested in the judicial department and in this Court have been broadly declared. Miss. Const. Art 6, § 144 (1890) is primary.[15]
The judicial power of the state shall be vested in a Supreme Court and such other courts as are provided for in this constitution.
The judicial power has been authoritatively read as including the power to make rules of practice, procedure and evidence.[16] That reading of the power is as much a part of *1346 our constitution as the doctrine of judicial review, at no point written in so many words but recognized as a core reality within our constitution in an unbroken line of cases from Runnels v. State, Walker (1 Miss.) 146 (1823) through Alexander v. State By and Through Allain, 441 So.2d 1329 (Miss. 1983).
We have today the question who sets the criteria by which we assign credibility to evidence so that it ought be considered by a court charged to decide life or liberty. The hearsay rule and its exceptions effect a delicate balance between the twin towering goals of the trial process: truth and fairness. We want our triers of fact to have all evidence that will aid them in the search for truth and at once we want every citizen brought before the bar of justice to have every fair opportunity to test the worth of that evidence. It is no truism but an article of faith that cross-examination is the best tool we have for exposing truth. Lanier v. State, 533 So.2d 473, 488 (Miss. 1988); Pulliam v. State, 515 So.2d 945, 947 (Miss. 1987); Prewitt v. State, 156 Miss. 731, 735, 126 So. 824, 825 (1930). Admitting evidence that has not been cured in the crucible of cross-examination challenges the soul of the trial process. Deciding when and whether that fateful step may be taken is a matter lying "at the core of the judicial function," State v. Robinson, 153 Ariz. 191, 197, 735 P.2d 801, 807 (1987).
Historically, admissibility vel non of hearsay evidence has been a subject of exclusive concern of the judiciary of this state.[17] Our rules developed in a common law fashion and date back into the last century. See, e.g., Wells v. Shipp, Walker (1 Miss.) 353 (1829); Melius v. Houston, 41 Miss. 59, 63 (1866); Barclay v. Smith, 36 So. 449 (Miss. 1904); Simmons v. State, 105 Miss. 48, 56-57, 61 So. 826 (1913). By order entered September 24, 1985, this Court invoked its rule-making power and declared a codification of the hearsay rule and exceptions thereto. This declaration took the form of the Mississippi Rules of Evidence, the hearsay provisions of which appear in Rules 801-806. Our order implementing these Rules[18] is the ultimate authoritative declaration that the making of rules of evidence, and particularly rules regulating the use of hearsay evidence, lies on judicial turf. As trials are the core activity of the judiciary, so the promulgation of rules for the regulation of trials lie at the core of the judicial power. That being so, it only follows that the officers of neither the legislative nor executive departments of government, acting jointly or severally, had authority to confer legal validity upon the Evidence of Child Sexual Abuse Act.[19] As that act enjoys no legal validity, it may not be regarded "law" within Rule 802, Miss.R.Ev.[20]

E.
To the point at hand, concern for the problems of hearsay evidence belongs to *1347 the judiciary historically, functionally, but practicably as well. We are well aware that the matters addressed by the Evidence of Child Sexual Abuse Act have been the subject of nationwide study and controversy.[21] Suffice it to say that the empirical assumptions of the act are hotly disputed by experts in the field. We would regard it precipitous to enact such amendments to our Rules of Evidence without careful empirical investigation and thoughtful reflection.
The social phenomenon of child sexual abuse has been thrust upon society's collective conscience. Its cruelty has seared that conscience. Society demands vigorous prosecution of those who sexually abuse children, and rightly so. Among the difficulties we encounter en route to such prosecutions are the content of the rules for receiving or rejecting evidence. Few charges are more difficult to defend. Yet we are told that the needs of the victim and the practical realities of such prosecutions require rules of evidence different  and more relaxed  than those we would otherwise enforce.
We are fortunate that we have available the resources and dedication of the Advisory Committee on Rules.[22] That Committee performed the gargantuan task of developing our Mississippi Rules of Evidence which this Court adopted with only a handful of changes. The raison d'etre of that committee is to facilitate the competent study of proposed amendments to our Rules and, in the end, to make recommendations to the Court. That Committee has modest financial resources with which to obtain the services of experts with advice regarding difficult matters just such as that now before us. We take this means of referring to our Advisory Committee the entire subject of evidence of child sexual *1348 abuse and charge that with all deliberate speed the Committee study and investigate the matter and, in the end, recommend whether and to what extent we ought amend the Mississippi Rules of Evidence.[23] In the end, the Justices of this Court, with their training, experience and competence, aided by an able staff of law clerks, accept responsibility for adopting or rejecting any amendments that may be suggested.

F.
In view of what we have said above, we may only hold that the Circuit Court erred when it admitted Chad's out-of-court statements through the witnesses Graham and Chance. There is, to be sure, other evidence in the record suggesting Hall's guilt. We have the physical findings of Dr. Julia Sherwood suggesting that Chad had experienced unnatural sexual contact. Keith, Chad's ten-year-old brother, gave particularly damning testimony. Still, we attribute great impact to Chance's telling the jury the childlike but picturesque story Chad told her. And the same of Graham.
Our question becomes whether receipt of this evidence denied Hall a substantial right. Rule 103(a), Miss.R.Ev. Our hearsay rules are designed to secure to both prosecution and defense a fair trial. Where, as here, substantial evidence of a material fact has been admitted in violation of our hearsay rules, it follows as the night the day that the defendant has been denied a fair trial. See Ponthieux v. State, 532 So.2d 1239, 1248 (Miss. 1988).
The judgment of the Circuit Court that Michael A. Hall stand convicted of the crime of sexual battery and the sentence of imprisonment imposed thereon are reversed and this case is remanded to the Circuit Court for a new trial.

G.
Two further points merit note.
The effect of our decision is that the Circuit Court erred as well in denying Hall's motion for a new trial. Hall will now get that new trial. When we reverse and remand for a new trial, both sides begin anew, no balls, no strikes. Except as we may otherwise direct, all issues are for trial ab initio. In the present context, the prosecution may have the opportunity to offer again Graham's and Chance's testimony and to attempt to qualify that testimony for admissibility under Rule 803(24), Miss.R.Ev.[24]
We recognize that Hall has this day tendered to us numerous issues above and beyond that considered and decided above. Some of these issues are difficult or important, or both. At times where such issues are likely to recur at retrial, we give our views for the guidance of the court and *1349 counsel. What we have said above is adequate to adjudge this appeal. The bite is quite as much as we this day ought chew.
REVERSED AND REMANDED FOR A NEW TRIAL.
ROY NOBLE LEE, C.J., PRATHER, SULLIVAN, ANDERSON and ZUCCARO, JJ., concur.
DAN M. LEE, P.J., concurs in result only.
HAWKINS, P.J., dissents by separate written opinion.
PITTMAN, J., not participating.
HAWKINS, Presiding Justice, dissenting:
I am grateful to the majority for making quite plain its reason for reversing this case. Under the majority's holding the Legislature had no constitutional authority to enact Chapter 345, Laws 1986 (Miss. Code Ann. § 13-1-401, et seq.,), a comprehensive series of statutes dealing with evidence in child sexual abuse cases.
As the majority notes, the portion of the Act addressed in the opinion enlarges the power of courts to hear hearsay evidence beyond that which we have granted ourselves under our Rules of Evidence.
Again, as the majority makes clear, the question of whether any portion of the Act used in the prosecution of this case violated some constitutional right of the defendant, e.g., the 6th or 14th Amendment, need not be addressed. Because this comprehensive Act violates this Court's right, the right of this Court alone under the Mississippi Constitution to decide what shall and what shall not be admitted into evidence in trial courts, we need go no further. The Legislature has trespassed upon Constitutional authority vested exclusively in this Court to decide what is and what is not competent hearsay evidence, and for this reason the Act has no validity whatever. The majority graciously states that we will consider advice from them as to such a law. (Footnote 20, majority opinion) The Legislature, of course, did not see fit to seek our advice before enacting these laws.
It does not matter that these laws meet a public need, and if it had been we who had adopted them rather than the Legislature, they would be perfectly valid. The wrong body of our state government enacted them; they should have come from us. The Legislature lacked "subject matter" jurisdiction and had no more authority to enact them than would a board of supervisors.
The majority brings to mind a courtroom story about a distinguished attorney of our state, the late Weaver Gore, also noted for his acerbity. He is reputed to have been reading from his law book in making an argument when the judge told him, "That's not the law, Mr. Gore."
Whereupon, Mr. Gore tore the pages from his book and replied, "If this is not the law, I don't want these pages in my book."
The majority has told the circuit judge he had no right to even consider these laws. They are worthless. Thus has the majority figuratively torn out seven pages of the Code and thrown them into Ollie North's shredder.
Pfft. Pfft. They are gone.
In my view the Legislature acted well within its sphere of Constitutional authority in enacting Miss. Code Ann. § 13-1-401, et seq., and this Court has no Constitutional authority in strike it. It is this Court, charged by sacred oath to be guardians of our Constitution, which is trespassing into forbidden territory, and not the Legislature in passing an Act of this nature. Indeed, the Legislature is to be commended for its public service in passing this Act.
The majority is stingy with its citations. Other states' experiences with this question are ignored. The citations the majority does give, as examination reveals, are no support.
In Xanadu did Kubla Khan
*1350 A stately plesure dome decree
Where Alph, the sacred river, ran
Through caverns measureless to man
Down to a sunless sea.
Samuel Taylor Coleridge dreamed the words to this poem, and Kubla Khan, being a dream king, did not need to build a palace; he simply "decreed" it out of thin air.
The majority has decreed unto itself an authority out of thin air. It exists at no place except in the heads of the majority.
One more point needs to be made absolutely clear before I proceed into my little essay. I have no quarrel with, and indeed am a charter subscriber to this Court's assertion of authority in adopting rules of procedure and evidence.[1] I have no desire to retreat from the positions we have taken. My quarrel is with the holding of exclusivity of the majority that the Legislature has no Constitutional authority to pass laws dealing with evidence or procedure. We are now "King of the Hill" and they must stay off.
The majority might wish it had such authority, and conceivably might argue that in the interest of better government, we ought to have it. (I would seriously challenge this assertion, however.) Unfortunately for the majority's contention, our Constitution grants no such authority. There are state constitutions which do specifically grant their Supreme Courts superintending control over trial courts, and power to enact rules of practice. Our Constitution contains no such grant.
Our Polaris is our own Constitution:
ARTICLE 1. DISTRIBUTION OF POWERS.
Section 1. The powers of the government of the state of Mississippi shall be divided into three distinct departments, and each of them confided to a separate magistracy, to-wit: those which are legislative to one, those which are judicial to another, and those which are executive to another.
* * * * * *
Section 2. No person or collections of persons, being one or belonging to one of these departments, shall exercise any power properly belonging to either of the others. The acceptance of an office in either of said departments shall, of itself, and at once, vacate any and all offices held by the person so accepting in either of the other departments.
ARTICLE 6, Sections 144 and 146 read:
Section 144. The judicial power of the state shall be vested in a Supreme Court and such other courts as are provided for in this constitution.
* * * * * *
Section 146. The Supreme Court shall have such jurisdiction as properly belongs to a court of appeals.
Section 146 was amended in November, 1983, and any plain reading of it shows the Court's power, insofar as adopting rules, was certainly not enlarged; indeed, if anything, restricted:
Section 146. The Supreme Court shall have such jurisdiction as properly belongs to a court of appeals and shall exercise no jurisdiction on matters other than those specifically provided by this Constitution or by general law.[2] [Emphasis added]
*1351 What about Legislative power?
ARTICLE 4, Section 33 reads:
Section 33. The legislative power of this state shall be vested in a legislature which shall consist of a senate and a house of representatives.
This Court has no Constitutional authority whatsoever to exclude the Legislative branch from enacting any statutes of this nature. It is through the Legislature that the people enact laws of their choice. Legislative power, emanating as it does from the people, embraces all law-making power on every subject not prohibited by the Constitution. "The Legislatures of the state of Mississippi have all political powers not withheld in her own Constitution, or in conflict with the Constitution of the United States." Hinton v. Perry County, 84 Miss. 536, 547, 36 So. 565, 567 (1904); Farrar v. State, 191 Miss. 1, 2 So.2d 146, 148 (1941); State Ex Rel. Knox v. Grenada County, 141 Miss. 701, 105 So. 541, 546 (1925); Moore v. Grillis, 205 Miss. 865, 39 So.2d 505 (1949); Ex Parte Dennis, 334 So.2d 369, 373 (Miss. 1976); State v. Edwards, 93 Miss. 704, 46 So. 964 (1908).
Citing no specific provision of the Constitution either withholding or prohibiting the Legislature from enacting procedural and evidentiary laws applicable to courts, it is strange reasoning for the majority to say that the people, speaking through the Legislature, the only manner in which they can speak, can enact no such law under our Constitution.
The Legislature is "a representative body which makes the laws of the people." 52A C.J.S. Legislature, p. 765. Hawke v. Smith, 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871 (1920).
Unless prohibited by the state or U.S. Constitution,
[S]tate legislatures have power to enact statutes or laws, which power has been characterized in various ways, such as absolute, plenary, or supreme... . and in the exercise of this authority, and in the discharge of this duty, the sweep of its vision is as wide as the confines of human knowledge.
82 C.J.S., Statutes, § 9, pp. 23-24.
16 C.J.S. Constitutional Law, § 106, pp. 491-492:
It has been said that the legislative department has all power not expressly denied it or given to another branch of government, and that wherever the legislative power of a government is undefined it includes the judicial and executive attributes, and that so great is the scope and extent of this authority that, in the absence of constitutional restrictions, the department wielding it might with comparative ease absorb within itself all the functions of the state.
The majority assumes some contest between this Court and the Legislature, totally ignoring that in enacting this Act the Legislature spoke for the people. The majority is not picking a fight with the Legislature, but with the people. Guess who is going to win?
It is historical fact that the Mississippi Legislatures did for at least 130 years enact statutes on practice and procedure in courts of this state, statutes "at the core of the judicial function," to use the metaphor of the majority, and it was never questioned but that in doing so they were fulfilling their Constitutional responsibility.[3] The 1942 Code contains two full volumes regulating circuit and chancery court practice, Volumes 2 and 2A, and the 1972 Code likewise contains two full volumes, 3 and 4. Every lawyer who has been practicing for ten years or more knows this from personal *1352 experience. It is of course true that the vast majority of rules of evidence have evolved by common law decisions, yet it has never been doubted by this Court that the Legislature had the power to enact laws pertaining to evidence on its own. Thus, in Brunt v. Watkins, 233 Miss. 307, 101 So.2d 852 (1958), this Court held that the Legislature had authority to enact an exception to the hearsay rule:
There is no doubt that the report of the Welfare Department was hearsay. Apart from the question of due process, the Legislature has the power to establish rules of procedure and evidence, except that in criminal prosecutions, Article 3, Section 26, of the Constitution of Mississippi guarantees to the accused the right to be confronted by the witnesses against him.
233 Miss. at 311, 101 So.2d at 854. Also, Jones' Estate v. Culley, 242 Miss. 822, 134 So.2d 723 (1961).
Not only in Mississippi, but generally throughout the United States it has been accepted that the Legislature was exercising a Constitutional prerogative in passing procedural or evidentiary statutes. As to authority of state legislatures to enact statutes on procedure, see 16 C.J.S., Constitutional Law, § 124 and § 132; 21 C.J.S. Courts, § 170, and authorities cited. As to evidence, 29 Am.Jur.2d, Evidence, § 9, states:
It is well settled that the legislature of a state has the power to prescribe new, and alter existing, rules of evidence, or to prescribe methods of proof, provided they do not violate constitutional requirements or deprive any person of his constitutional rights. Moreover, so long as they do not violate any constitutional rights, the rules of evidence are subject to the control of, and modification by, the legislature.
And, 16 C.J.S. Constitutional Law, § 129, states:
The legislature cannot unduly circumscribe the power of the courts to determine facts and apply the law to them, or determine the sufficiency of the evidence. However, the legislature, as a general rule, has authority to establish, modify, and control rules of evidence to the extent that such rules are not in conflict with the constitution or with the rights guaranteed by it.
Several hundred decisions are cited under each of the above headings. Also, Wigmore, § 7, p. 462 (Tiller ed. 1983), "... a legislature has the power to alter or create any rule of evidence."; Edgeworth v. Edgeworth, 239 Ga. 811, 239 S.E.2d 16 (1977); Belluomo v. KAKE-TV & Radio, Inc., 3 Kan. App.2d 461, 596 P.2d 832 (1979).
After all this, with no amendment to our Constitution, why is it suddenly unconstitutional for the Legislative branch to enact any statute dealing with practice, procedure or evidence in the trial courts? After exercising a virtually exclusive authority to enact laws dealing with procedure, and enacting statutes on evidence as deemed necessary and in the public interest for over 125 years, how is it the majority can claim there is no Constitutional authority whatever in the Legislative branch to enact this or evidentiary law today?
Other than a bald assertion, unaccompanied by any historical analysis, that the separation of powers of § 1 gives this Court such power, the majority makes no attempt to explain. This assertion is contrary to history. Clearly, the authors of our 1890 Constitution, as did the framers of our previous state constitutions, recognized that it was the Legislative branch which enacted statutes on court procedures. It would be a gross distortion of history to state otherwise. The separation of power doctrine was in the Constitutions of 1817, Art. II, §§ 1, 2; 1832, Art. II, §§ 1, 2; and 1868, Art. III, § 1. Yet, the majority tells us that the Legislative branch had no more authority to enact Miss. Code Ann. § 13-1-401, et seq., than would a board of aldermen.
As we have already seen, the Legislative branch, as the voice of the sovereign people, has the Constitutional authority (at *1353 least until the majority spoke) to enact any law not specifically prohibited by the Constitution. There being no Constitutional prohibition against enacting procedural statutes, then clearly the Legislature is usurping no power in enacting procedural statutes.
How then can the majority claim it is unconstitutional when the Legislative branch enacts such a law?
The majority has an even more serious hurdle, which it also completely ignores. Our Constitution plainly and specifically grants unto the Legislature the power by general law to enact laws on procedure. Article 4, Section 90:
Section 90. The legislature shall not pass local, private, or special laws in any of the following enumerated cases, but such matters shall be provided for only by general laws, viz.:
* * * * * *
(s) Regulating the practice in courts of justice.
Thus the Legislative branch, and not this Court, has a specific Constitutional mandate to pass laws "regulating the practice in courts of justice." The only inhibition whatever in the Constitution is that the laws dealing with practice must be general laws.[4]
The majority has flatly told every circuit judge and trial lawyer in this state they may as well tear out the code pages containing Miss. Code Ann. § 13-1-401, et seq., and put them in shredders.
Is the majority telling the Legislatures to do the same thing to § 90(s) of our Constitution? Telling the Legislatures they have no constitutional authority to follow a specific and clear Constitutional mandate?
It takes only a modest scrutiny to see the flaws in the contention that the "separation of powers" grants this Court "inherent" exclusive authority to promulgate rules. Well, we say, the Legislature prescribes its rules, but § 55 of the Constitution expressly gives each house that power. If we followed the majority's rationale, we could not declare a duly-enacted statute unconstitutional, that being exclusively legislative. By the same token an executive officer could claim a violation of separation of powers because a statute prescribed procedures for fulfilling his duties.[5] How far would he get in court making such a claim?
I cannot understand the majority's denial of what I should think obvious to any student of government, and to every law school graduate: that the very strength of separation of powers is dependent upon no branch being absolutely independent.
Madison saw clearly that the point of the separation of powers was not some aesthetically pleasing distribution of every government function but the effective dispersal of power among separate, and to some degree, antagonistic parties. The object of the constitutional arrangement was to prevent the tyranny which would follow the accumulation of too much power in any one set of hands... . To achieve this object separation alone is not the crucial element. Separation of power must be coupled with the requirement that all significant actions of any department undergo review by an independent department. "Ambition must be made to counteract ambition." Such checks and balances necessarily mean that more than one department has a role in the exercise of the various governmental powers. It is in the protection against uncircumscribed power in any department of government that the real value of the separation of powers lies.
Kay, The Rule-Making Authority and Separation of Powers in Connecticut, 8 *1354 Conn.L.Rev. 8 (1975) 1, pp. 40-41, and citing J. Madison, The Federalist, No. 47 (C. Rossiter ed. 1861); Gibbons, The Interdependence of Legitimacy: An Introduction to the Meaning of Separation of Powers, 5 Seton Hall L.Rev. 435, 436 (1974). Also, Nixon v. Administrator of General Services, 408 F. Supp. 321, 340-342 (1976).
And finally, as to the assertion that somehow encompassed in the very general "separation of powers" phrase we have the power to tell the Legislature they have no Constitutional authority to enact valid statutes regulating court procedures, the majority ignores another basic principle. As the majority so eloquently told us in Dye v. State Ex Rel. Hale, 507 So.2d 332, 343 (Miss. 1987):
First, constitutional provisions should be read so that each is given maximum effect and a meaning in harmony with that of each other... . To the extent that conflict may appear, specific provisions such as Sections 55 and 129 control control over general provisions such as those of Sections 1 and 2.
Strike from the above quote "Sections 55 and 129" and insert "Section 90(s)", and tell me where this leaves the majority?
Nor can I understand how there can possibly be any claim this Act meets the fundamental standard we have applied before declaring any statute unconstitutional. Before we have authority to declare a duly-passed Act of the Legislature unconstitutional, we must find beyond a reasonable doubt that it violates the state or federal Constitution.
In State v. Edwards, 93 Miss. 704, 46 So. 964, 966 (1908), this Court held:
The courts have always had such consideration for the Legislature that they have uniformly declined to hold an enacted statute unconstitutional unless it was violative of organic law, state or federal, beyond a reasonable doubt. It is universally recognized that a state Legislature has all power not withheld from it expressly or by necessary implication. [Emphasis added]
Also, St. Louis & S.F. Ry. v. Benton County, 132 Miss. 325, 96 So. 689 (1923); Miller v. State, 130 Miss. 564, 94 So. 706 (1922); Quinn v. City of McComb, 212 Miss. 730, 55 So.2d 479 (1951); Wheeler v. Shoemake, 213 Miss. 374, 57 So.2d 267 (1952); Broadhead v. Monaghan, 238 Miss. 239, 117 So.2d 881 (1960); Peterson v. State, 268 So.2d 335 (Miss. 1972); Masonite Corp. v. State Oil and Gas Board, 240 So.2d 446 (Miss. 1970); Anderson v. Fred Wagner, etc., 402 So.2d 320, 321 (Miss. 1981). And, as recently as 1984, in Mississippi Power Co. v. Goudy, 459 So.2d 257, 264 (Miss. 1984), we reiterated:
Courts must presume that a statute enacted by the Legislature is constitutional and its unconstitutionality must appear beyond a reasonable doubt.
The majority has told the Legislature and the people that the Legislature had no more authority to pass this Act than a school board. Why? Because the majority has decreed this Court has the exclusive constitutional authority to adopt, enact, or amend any hearsay rule of evidence in courts. And of course, it is clear "beyond a reasonable doubt" the Act is unconstitutional.
I mean no disrespect. I wish somehow, some way, I could believe I am mistaken. Yet to me, stating with a straight countenance that Judas Iscariot was an honorable man is no more preposterous than solemnly holding this Act is unconstitutional beyond a reasonable doubt.
That we are a separate and co-equal Constitutional branch of government I have no doubt. Further, I have no doubt that we would have a duty to declare any law that impedes justice unconstitutional. A court's Constitutional duty to administer justice fairly and equally can be neither diluted nor strangled by some procedural statute. It takes a quantum leap in judgment, however, to jump from this conclusion to the holding that this Court has the exclusive power to modify a hearsay rule of evidence in a criminal case. Alexander v. State By and Through Allain, 441 So.2d 1329 (Miss. *1355 1983), is validation of the separation of powers doctrine which I wholeheartedly espouse. It is no authority for the majority holding. We held in that case that members of the Legislature could not under our Constitution sit or serve as officers in the Executive branch. We did not hold the Legislative branch had no authority to pass laws at the "core of the administration of executive duties."
I entertain not the slightest doubt but that the people, in the absence of infringing upon some constitutionally guaranteed right of the parties litigant, have the absolute authority under our Mississippi Constitution to go to the "core of the core" of this arrogated "judicial function." The courts of this state belong to the people, not to the sitting judiciary, and certainly not to whoever happens to constitute five members of this Court. Judges are trustees, fiduciaries to carry out the will of the people in administering justice, not the beneficiaries.

INHERENT AUTHORITY?
The majority has assumed some sort of "inherent authority" to exclude the Legislature. Where did we get this "inherent authority" to tell the Legislature it can pass no procedural statutes when § 90(s) specifically grants them the power. Is this not odd reasoning?
The majority is beginning to make me skeptical of claims to "inherent authority." Obviously "inherent" authority is authority you claim to have which has not been explicitly granted. Otherwise, there would be no need to claim an "inherent" authority. Just as obvious, the legitimacy of the authority can rise no higher than the validity of the claim in the first place.
I am not being facetious with the majority's argument. But, I am inescapably reminded of the Old Testament and Moses coming down from Mt. Sinai with the tablet of commandments. One read, "Thou Shall Not Kill." No doubt the tribes wondered precisely what was meant by "Thou Shall Not Kill." Obviously it could not mean lions and wild beasts. And, pretty soon it did not mean goats and sheep. Well, what about the Moabites? The Hittites? By and by the Hebrews decided they had the inherent right to kill them, too. Then followed the Philistines. The Commandment to the contrary notwithstanding, they had the inherent authority to slaughter Philistines in droves.
A claim of "inherent power" can get risky. It can get especially so when there is no one to dispute the claim.[6]

READING CLASS
The majority's problem goes on. Even if it were confessed that this Court had all the authority the majority claims it has, it remains an absolute fact that our own Rules provide for hearsay exceptions not just by this Court, but by the Legislature as well.
Please read with me Rule 802.
RULE 802. HEARSAY RULE
Hearsay is not admissible except as provided by law. [Emphasis added]
Comment
Rule 802 is a statement of existing common law. [Emphasis added]
Is a statute a "law"? Section 90 of our Constitution states that our Legislature passes laws. Of course it is absurd to argue that Miss. Code Ann. § 13-1-401, et seq., are not a series of laws.
Indeed, it could be more plausibly argued that our Rules provide that only the Legislature can make any exceptions to our hearsay rule. Courts have no authority to enact laws. We can only pronounce the *1356 law as we perceive it to be. Mabray v. School Board of Carroll County, 162 Miss. 632, 137 So. 105 (1931). While we have asserted the authority to promulgate rules of procedure, we never had the audacity to claim any of them are laws. (We did assert the authority to repeal laws in MRE 1103.) Only the Legislature can pass a law.
Well, what about the comment that Rule 802 is a statement of existing common law when the rules were adopted? Again the answer is clear, though with no comfort to the majority. Brunt v. Watkins, supra, made the common law observation that the Legislature was free to pass a law on evidence. In re Mundy, et al., 97 N.H. 239, 85 A.2d 371 (1952) held:
There is no occasion to further extend citation on this subject. It is apparent from the above that the Legislature and even the courts may make valid exceptions to the hearsay rule.
Also, 29 Am.Jur.2d, Evidence, § 9; 16 C.J.S. Constitutional Law, § 129, supra. It would be equally absurd to contend that under common law decisions it was not universally recognized that the Legislature had authority to enact statutory exceptions to the hearsay rule.
The majority is at least gracious enough not to ignore Rule 802 as it has other impediments to its rationale. But, how does it answer it? While admitting this Act is a law, the majority tells us it must be a "valid law." The Rule says nothing about a "valid" law. Indeed by use of the word "law" the Rule clearly means that the Legislature, as well as this Court, can provide for exceptions to the hearsay rule. State v. Ryan, 103 Wash.2d 165, 178, 691 P.2d 197, 206 (1984).
The majority on its own amends Rule 802 and tells us that it must also be a "valid" law. Well, there is no question but that Miss. Code Ann. § 13-1-401, et seq., was duly passed by the Legislature and signed into law by the Governor.
But, the majority says it is not a "valid" law; in fact, it has no validity whatever. And, why is it not a "valid" law? Because, says the majority, the Legislature had no right to pass it in the first place. According to the majority, it is an utter impossibility for the Legislature to pass any laws creating a valid exception to the hearsay rule, Rule 802 to the contrary notwithstanding.
One can only marvel at this dancing around the May pole reasoning.
The majority accepts no boundary upon its freedom to write a new meaning for plain words, and say a word means whatever suits the majority's fancy. Laws, statutes, rules, the Constitution can have whatever meaning comes from the fertile imagination of the majority.[7]
In my view it is utter nonsense to contend the Legislature could not enact a valid exception to the hearsay rule.

HOW WE GOT HERE
As above noted, for over 125 years the Legislature exclusively enacted statutes on circuit and chancery court practice, and from time to time enacted statutes dealing with evidence in courts. This was in accord with generally accepted practice throughout the United States; 16 C.J.S., Constitutional Law, §§ 124, 132; 21 C.J.S., Courts, § 170; 29 Am.Jur.2d, Evidence, *1357 § 9, supra.[8]
Let us take our bearings and see how we got here. The movement for Mississippi to modernize its court procedures began over forty years ago.[9] With the exception of Chapter 230, Laws 1948, abolishing pleas in circuit court (§ 1475.5, Code of 1942; § 11-7-59 Code of 1972), virtually no pleading change was made over these years.
The agitation continued unabated, and in 1972 the Honorable Lawrence J. Franck wrote an article in the Mississippi Law Journal, arguing that this Court had the inherent power to adopt rules governing practice in the trial courts which would supplant antiquated pleading statutes. See: Franck, Practice and Procedure in Mississippi: An Ancient Recipe for Modern Reform, 43 Miss.L.J. 287 (1972).
Then, in Newell v. State, 308 So.2d 71 (Miss. 1975), this Court struck as unconstitutional that portion of two statutes prohibiting a circuit judge from instructing juries except upon written request of the parties. This was a perfectly valid exercise of judicial power, because these provisions prevented a judge performing a duty imposed upon him by oath, namely: "to administer justice." Art. VI, § 155. Nor, would these have been anything unusual in declaring such provisions denied due process. Greene v. Lindsey, 456 U.S. 444, 102 S.Ct. 1874, 72 L.Ed.2d 249 (1982); Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).
It was also necessary in that case for the Court to supply a rule to fill the hiatus, the gap which existed when this portion of the statutes was struck. We therefore quite properly held we had "inherent power" to provide rules for this situation. This was absolutely all the case required for resolution. And, any implication that the Court intended to extend its rule-making authority beyond that of necessarily supplying a rule to fill this procedural gap would, of course, have been dictum.
This Court made another statement, somewhat enigmatic. After quoting § 144, we stated:
This leaves no room for a division of authority between the judiciary and the legislature as to the power to promulgate rules necessary to accomplish the judiciary's constitutional purpose.
Newell, supra, at 77.
This unquestionably was dictum. No one would argue that if some statute such as §§ 11-7-155 and 99-17-35 impeded justice, or denied due process, any court would be duty bound to strike it under the Constitution. If this is what was meant by the statement, I have no quarrel with it, although it was dictum. but, if it had purported to remove from the Legislative branch authority to enact procedural statutes which do not infringe upon some Constitutionally-guaranteed right of a litigant, i.e. to remove from the Legislature this subject matter jurisdiction, I reject it entirely. That would not only be dictum, but hokum as well. § 90(s) Miss. Const. I do *1358 not for one moment believe the Court meant this. The Court's own conduct for the next six years shows no intent whatever to assert unto itself the sole authority to promulgate rules.[10]See also, Haralson v. State, 308 So.2d 222 (Miss. 1975), and the wisdom of the late Chief Justice Gillespie in his concurring opinion. 308 So.2d 224.
Newell, supra, was handed down in January, and Haralson in February, 1975.
The Legislature's response to these decisions was Chapter 501, Laws 1975 (Miss. Code Ann. § 13-1-201, et seq.; § 9-3-61, et seq.), enacted April 17, 1975. The first fourteen sections (§ 13-1-201, et seq.) enacted a comprehensive pre-trial discovery, modeled after the federal rules. The remaining sections authorized the Supreme Court to prescribe rules of practice in the trial courts, including rules of evidence, subject however to the provisions of the Act. An advisory committee was authorized under the Act (§ 9-3-65), and the rules as finally adopted were to be submitted to the Legislature for approval. Unless disapproved by either of the two judiciary committees or vote in the Legislature, the rules were to become effective (§ 9-3-71). Pursuant to this Act a 14-member advisory committee, one of whom was a Justice on this Court, began monthly meetings in July, 1976, to recommend proposed rules. This committee continued its work through 1977, consulting with lawyers, judges and attorneys' associations throughout the state.
The proposed rules were published in pamphlet form in May, 1978, and copies mailed to all lawyers in the state.
This enormous activity of labor, time and expense proved an exercise in futility. The Judiciary En Banc Committee of the House of Representatives rejected the proposed rules in their entirety. See: Resolution of Judiciary En Banc Committee, dated October 10, 1979.[11]
By Order of May 20, 1981, this Court adopted the Rules proposed in May, 1978, with only Rules 4 and 14 being deleted. In adopting the Rules, we cited the inherent power of this Court to do so under Newell, supra. No other Court in the United States has ever adopted a blanket set of rules in the absence of explicit statutory or constitutional authority therefor. Page, Constitutional and Judicial Rule Making, 3 Miss.Coll.L.Rev. 1, 2 (1982).
This Court was sharply divided over the adoption of the MRCP. Justice Broom in his dissent questioned the Constitutional authority under § 90(s). The Legislature was extremely, overwhelmingly hostile to this action. Footnote 1, supra; Page, 3 Miss.Coll.L.Rev., pp. 6-8, supra. The 1983 amendment to § 146 was clearly aimed at preventing future encroachments by this Court into an area the Legislature considered its own.
Then, in 1985 this Court was presented with the proposed Rules of Evidence, MRE. This time, contrary to the Rules of Civil Procedure, the lawyers not only had no objection, but overwhelmingly approved them. As a consequence, and fortuitously for this Court, the Legislature was completely passive, and took no note of the action. No question as to the meaning of amended § 146 was raised; a Constitutional crisis was thus avoided. For the most part, these rules constitute a restatement of common law evidentiary rules evolved over time, here and there cleaning out old dustbins. Also, rules pertaining to evidence, unlike pleadings, have come almost *1359 entirely from common-law court decisions, not statutes on evidence. The rules for the most part were in accord with what few statutes on evidence were addressed by them. Thus, contrary to MRCP, there was little about the MRE to raise Legislative hackles for invading their turf.[12]
Rule 1103 states that all evidentiary rules, "whether provided by statute" or court decision which are "inconsistent" with MRE "are hereby repealed." Use of the word "repealed" is unfortunate, because this Court has no Constitutional authority whatever to "repeal" any statute.
Adoption of the MRCP was a necessity in order to remove outmoded impediments to the functioning of the judiciary. To a much lesser degree, the MRE hopefully have served a needed purpose. Likewise, this Court's assertion of its independence, and entitlement to make rules on behalf of our courts should remain safeguarded. While many reputable attorneys opposed the adoption of the MRCP in 1981, I believe the overwhelming majority of the bar and informed citizenry now recognize that the Court did improve the fair and efficient administration of justice in our courts.
I certainly do not want to retreat from our position, and I do not think there is any danger of this occurring, unless this Court on its own precipitates a controversy.
This is precisely what I fear the majority risks by this decision.
Judgment, discernment is called for.

THIS COURT'S AUTHORITY
As I have pointed out, our Constitution is silent on this Court having any superintending control over trial courts, or power to adopt rules of practice. The amended § 146 gives us appellate jurisdiction only, and then directs us to "exercise no jurisdiction on matters other than those specifically provided by this Constitution or by general law." [Emphasis added] This is pretty plain.
We should be brutally honest. It was this Court, not the Legislature, which stretched the import of the Constitution's words to their limit in asserting we had the power under our Constitution to promulgate blanket rules. If this Court had had the slightest inkling we had the "inherent" powers of the Constitution to enact legislation, why did we spend forty years pleading with the Legislature to lead us out of the wilderness when all that time we had the right to do it on our own? To do so, we had to claim an "inherent power," thereby conceding we had no specific grant of authority. That court procedures hopefully have been immeasurably improved by our action should not blind us to the inescapable fact that we, not the Legislature, have stretched our authority to the limit under our Constitution. And, it is most unlikely we would even have asserted this authority in the first place had the Legislature fulfilled its responsibility.
The majority now clearly carries us beyond any power we have asserted, and over the brink. It is one thing to assert, as I hope justifiably we have done, that we have Constitutional authority to adopt rules of procedure. It is quite another for the majority to assert the Legislature has no Constitutional power, no Constitutional authority on its own to enact procedural or evidentiary statutes, even when dictated by broad public policy and necessity. The Mississippi Constitution gives this Court no such authority.
As the majority apparently recognizes, we would be hard put to hold the hearsay exception embraced in Miss. Code Ann. § 13-1-403 conflicts with Rules 803 and 804. Rather, it gives the circuit court additional discretionary authority beyond what we have allowed under our Rules. The circuit court is not required to admit the *1360 testimony; and indeed, cannot even consider it until its trustworthiness is carefully vouchsafed.
The Act was to meet a public need to produce evidence in a sexual child abuse case without the crippling trauma of requiring a small child to testify, as in this case, against a parent. See: A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases, 83 Colum.L. Rev. 1745 (1983); Matter of C.L., 397 N.W.2d 81, 84 (S.D. 1986).
Miss. Code Ann. § 13-1-401, et seq. (1986) is clearly an expression of public policy of this state, and in response to the nationwide problem of child abuse, and prosecuting such criminal cases in courts. Graham, The Confrontation Clause, the Hearsay Rule, and Child Sexual Abuse Prosecutions: The State of the Relationship, 72 Minn.L.Rev. 523 (1988); Serrato, Note: Expert Testimony in Child Sexual Abuse Prosecutions: A Spectrum of Uses, 66 B.U.L.Rev. 155 (1988); Lacayo, "Sexual Abuse or Abuse of Justice?", Time, May 11, 1987, at 49; Kelly, Comment: Legislative Responses to Child Sexual Abuse Cases: The Hearsay Exception and the Videotape Deposition, 34 Cath.U.L.Rev. 1021 (1985); "Studies Find Sexual Abuse of Children is Widespread", New York Times, May 13, 1982, at C1, Col. 1; "Child Sexual Abuse: What Your Children Should Know" (PBS, Sept. 1984); "The Sexual Abuse of Children" (NBC-TV, Aug. 25, 1984); The Testimony of Child Victims in Sex Abuse Prosecution: Two Legislative Innovations, 98 Harv.L.Rev. 806 (1985).[13]
In response to the alarming number of child abuse cases permeating all classes of our society, a number of states have enacted statutes governing the admission of evidence in child abuse cases, of which the above are illustrative.[14]
I would still oppose what the majority does if our Constitution specifically gave us superintending control over trial courts, or authority to adopt rules of practice, although I could take some comfort in there being at least some basis in the claim of exclusivity. Why?

OTHER STATES
The majority also ignores that even in those states where their Supreme Courts do unquestionably and specifically have the authority on their own to enact rules of practice, their Courts have wisely recognized that statutes such as Miss. Code Ann. § 13-1-403 do not invade their rule-making power.
As I have noted, in most states their Supreme Courts either have been given specific constitutional or statutory authority to promulgate rules of practice. Kay, The Rule-Making Authority and Separation of Powers in Connecticut, 8 Conn.L. Rev. 1, 18, supra; Page, Constitutionalism and Judicial Rule-making, 3 Miss. Coll.L.Rev. 1, 2, supra. Wigmore, § 7, footnote 1, pp. 462-468, supra.
Yet the Supreme Courts of those states generally recognize the validity of sexual abuse statutes. Those courts which do have some legitimacy to claim exclusivity in promulgating rules of evidence nonetheless decline to assert it, while this Court, with no legitimacy whatever to such a claim tells the Legislative Branch it has *1361 no subject matter jurisdiction of this kind of statute.
The need for such statutes was set forth in A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases, 83 Colum.L.Rev. 1745 (1983). The residual exception of Rule 803(24) was criticized as having been created for a number of heretofore unrecognized situations, and not specifically designed for hearsay statements of sexually abused children. The author concluded by recommending a statute such as had been passed in Washington. See: 1982 Wash. Legis. Serv., Ch. 129, § 2 (West). In that state the Supreme Court by statute is given exclusive authority to promulgate rules, and any statute in conflict with a rule is ineffective. R.C.W. 2.04.190; 2.04.200.
In Emwright v. King County, 96 Wash.2d 538, 543, 637 P.2d 656, 659 (1981), involving procedural statute versus rule, the Court observed that "definite and analytical lines marking the separation of powers often cannot be drawn and there must necessarily be `some mingling and overlapping of powers between the three separate departments of our government.'" And also, "All provisions should be harmonized whenever possible, and an interpretation which gives effect to both provisions is the preferred interpretation." 96 Wash.2d. at 543, 637 P.2d at 659.
The Florida Constitution expressly directs that its Supreme Court "shall adopt rules for practice and procedure in all courts." Art. V, § 2, Florida Constitution (effective January, 1973). In 1985 that state's Legislature enacted a hearsay statute similar to ours, § 90.803(23) Florida statutes. In Florida v. Jano, 524 So.2d 660 (Fla. 1988), the Court, in reversing for erroneous admission of evidence, commented:
While not dispositive with respect to the opinion, we note that subsequent to the trial of this case, the legislature responded to the policy arguments now made by the state by enacting section 90.803(23) Florida Statutes (1985). This new legislation establishes a procedure by which certain hearsay statements of child victim's of sexual abuse may be admitted into evidence without reliance on the traditional exceptions to the hearsay rule.
Id. at 663.
In Commonwealth v. Willis, 716 S.W.2d 224 (Ky. 1986), the Kentucky Supreme Court held that a child abuse statute authorizing videotape of child's testimony did not violate rule-making power of the Court. 716 S.W.2d at 231. The Arkansas Constitution grants its Supreme Court rule-making authority, and it has promulgated rules of evidence. Yet that Court has ruled on three occasions as to evidence admitted under an evidentiary statute authorizing hearsay evidence. Cogburn v. State, 292 Ark. 564, 732 S.W.2d 807 (1987); Johnson v. State, 292 Ark. 632, 732 S.W.2d 817 (Ark. 1987); Hughes v. State, 292 Ark. 619, 732 S.W.2d 829 (Ark. 1987). The Court conspicuously avoided even addressing the validity of the statute as a violation of its rule-making power.
Under S.D.C.L. 16-3-2 the South Dakota Supreme Court "has power to make all rules of practice and procedure which it shall deem necessary for the administration of justice." That Court has promulgated rules of evidence modeled after the federal rules. Yet in Matter of C.L., 397 N.W.2d 81, 84 (S.D. 1986), it found that a sexual abuse statute identical to the Washington statute, S.D.C.L. 19-16-38 "superior in sexual abuse cases to both the spontaneous exclamation exception and the residual exception approach," of that Court's rules.
Colorado's constitution specifically grants its Supreme Court the power to "promulgate rules governing the administration of all courts and shall make and promulgate rules governing practice and procedure in civil and criminal cases... ." Colorado Constitution, Art. VI, § 21. In People v. McKenna, 585 P.2d 275 (Colo. 1978), the Colorado Supreme Court addressed the question of whether a "rape shield" statute prohibiting cross-examination, as to sexual conduct with other persons *1362 than the defendant, violated its inherent rule-making authority.
The Court recognized one test of distinguishing "procedural" from "substantive" matters was whether a rule's purpose was to permit a court to function efficiently, or whether "its impact is such as to conflict with other validly enacted legislative or constitutional policy involving matters other than the orderly dispatch of business." 585 P.2d at 277. The Court then held the basic purpose of the act was one of "public policy: to provide rape and sexual assault victims greater protection from humiliating ... `fishing expeditions' into their past sexual conduct." [Emphasis original]
Further, the opinion states:
Thus it reflects a major public policy decision by the general assembly regarding sexual assault cases. In effect the legislature has declared the state's policy to be that the victims of sexual assaults should not be subjected to psychological or emotional abuse in courts as the price of their cooperation in prosecuting sex offenders.
This statute represents the Colorado General Assembly's response to a national trend which began in 1974 to reform procedures governing state prosecutions of various sexual assaults.
* * * * * *
Seen in the light of the policy it embodies, the statute represents far more than merely a legislative attempt to regulate the day-to-day procedural operation of the courts.
585 P.2d at 278.[15]
Quoting from Chief Justice Marshall, the Court noted, that "a just respect for the legislature requires that the obligation of its laws should not be unnecessarily and wantonly assailed." 585 P.2d 278.
Finally, the Court held:
Although certain aspects of the instant statute necessarily touch upon judicial matters, we recognize that legislative policy and judicial rule-making powers may overlap to some extent so long as there is no substantial conflict between statute and rule.... While the three branches of our government are separate, equal and coordinate, they are nevertheless branches of one government, and they cannot operate in mutually exclusive, watertight compartments. If government is to serve the people, each branch must seek to cooperate fully with the other two. Confrontations of constitutional authority are seldom in the long-term public interest and therefore are to be avoided where possible. Rather, mutual understanding, respect and self-restraint, the lubricants of good government, are to be sought. While our duty may occasionally require us to declare unconstitutional a statute adopted by the general assembly, we hold that power in reserve to be exercised only when the statute at issue cannot be reconciled with the constitution.
585 P.2d at 279.
In City of Mound Bayou v. Roy Collins Construction Co., 457 So.2d 337 (Miss. 1984), we were not so bold. In a conflict between a purely procedural appeal statute and one of our appeal rules, we upheld the rule, after first noting:
[N]o important public policy considerations are implicated. It is within our rule-making authority to preclude enforcement of Section 9-13-33 in its entirety if we find such conducive to the *1363 proper administration of justice. [Citing Newell, Haralson, and Fairley v. State, 343 So.2d 483, 484 (Miss. 1977).]
Id. at 342.
If the Court meant what it wrote in Mound Bayou, then before this Court would strike a statute contrary to some rule, "no important public policy considerations" could be implicated. Also, we had to find that enforcement of the rule was "conducive to the proper administration of justice."
In this case, the clearest of public policy considerations are in the Act, and we do not bother even to look at whether or not it is "conducive to the proper administration of justice." The Legislature lacked subject matter jurisdiction and that is it.
It is this Court, not the Legislature, which may have trespassed upon the Constitution. We have acted without specific constitutional authority in adopting all encompassing rules of procedure in trial courts. The Legislature clearly has such specific authority, and now we tell them § 90(s) is meaningless.
As far as we have come, I do not want this to be the Fort Sumter court.
This assertion of exclusive authority will not go unchallenged nor should it.
It is interesting to note that even the Federal Rules, the genesis of the various states' adoption of uniform rules, were with the full participation, concordance and approval of Congress. Mistretta v. United States, ___ U.S. ___, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), affirming 682 F. Supp. 1033 (8th Cir.1988); 28 U.S.C., § 2076; Sibbach v. Wilson & Co., 312 U.S. 1, 9-10, 61 S.Ct. 422, 424-25, 85 L.Ed. 479 (1941). The U.S. Supreme Court never considered itself to have authority to promulgate Rules without Congressional approval.

THE BAD PART
All in all, there is another side to this claim of exclusivity, and it is dark.
1. I have shown that there is no Constitutional basis whatever for the majority's holding.[16] It is a quixotic idea that the umpire of a game should be vested with the exclusive authority to prescribe the rules. This ignores the players, the ones who ultimately win, as well as the one who must suffer the misery following losing. They are the ones directly affected, not the umpire. The players' voice in decision-making on rules is the Legislature.
2. The majority's claim of a functional need for this Court to assert sole authority is likewise dubious. Few would argue but that the judiciary should be entitled under our Constitutional form of government to some authoritative participatory role in making rules of procedure, and perforce we make almost all the evidentiary rules. It is one thing, however, to claim judicial competence. It is quite another to claim Legislative incompetence, which the majority must do to hold this Act an invalid exercise of power. And, "There is a distinctly undemocratic flavor to an argument that the court should give the people what they need, not what they want." Page, 3 Miss.Coll.L.Rev. 28. There can be no claim to a need to exclude the Legislature from any authoritative role.
Here again I must remonstrate the majority. In footnote 20 it says this Court is not giving the "back of its hand to every legislative enactment." No, the majority tells the Legislature that we will consider it and if we think well of it, in due course we may promulgate it as a rule. I do not think the Legislative Branch will look kindly upon our relegating its Constitutional role in enacting statutes to that of a supplicant. Nor, will the people. I do not think there will be any quid pro quo from the Legislature because of some of our recent favorable decisions.
3. The claim of exclusive expertise by this Court is likewise fallacious. We wrote *1364 none of the MRCP or MRE. Committees of lawyers and trial judges did the work. Are not able lawyers in the Legislature as well? The Judiciary Committees of both houses are lawyer dominated. They, too, have recourse to advisory committees from the bench and bar as well as the Attorney General. This Act obviously was drafted by a knowledgeable attorney. The claim that we are the sole repository of superior expertise to make rules is similar to a claim of some nobility, a select oligarchy beyond other branches of government, and the people. This is arrogant nonsense.[17] And, in this type of ominous crime, to frustrate efforts by the Legislative and Executive Branches to combat it with pompous  we know what is best for your  arrogance is not simply detestable, it is dangerous.
The majority forgets history. It was rigid, archaic, rules of common law pleading that brought about statutory changes in both in Great Britain and this country.
4. When we hold we have the exclusive authority in this area we negate the most basic principle of our government, that of checks and balances. We alone, we say, have the power and authority to enact court procedure. There is no appeal. There is no recourse to any other branch of government. Suppose we are wrong? Will we admit it?
5. To attempt to clearly separate rules into "substantive" and "procedural" is a quagmire, as futile as the search for "proprietary" and "governmental" in attempt to decide sovereign immunity for cities. But, what about public policy? Can we frustrate enactments embracing clear-cut, urgent public policy because we feel we know better? Just as the "power to tax is the power to destroy" the sole power to make rules of practice is the power to decide all cases long before they ever arise. By rules we can make it almost impossible to convict, or else almost impossible to acquit. This case is illustrative. We have taken a perfectly valid law making a carefully circumscribed exception to the hearsay rule in cases involving sexually abused children, quite similar to many other states' legislative enactments, and without examining its validity otherwise, declared it invalid because the Legislature lacked "subject matter" jurisdiction to pass any such law. Thus, we have unnecessarily made the State's burden much greater in these tragic cases.[18]
6. A court is created to administer justice, to decide cases, to administer the law in court on a case-by-case basis, not to legislate. This Court's basic function is that of appellate review, to decide whether the lower court erred. Yet we have indeed legislated, under another name, an enormous body of law. Promulgation of rules of procedure is lawmaking both serious and extensive. This final authority, under our constitutional system, is allocated to the Legislature, which is designed to be responsible to the electorate.
We have become some sort of super-administrative body of the trial courts. The Constitution makes no specific authorization for this; to the contrary, the amended § 146 states we "shall exercise no jurisdiction on matters other than those specifically provided by this Constitution and by general law." At this very time litigants of this state are in grave peril because this Court is loaded with far more cases, and issues of enormous complexity, than we have time to properly absorb and analyze. *1365 Time is our most precious resource. Yet we mandate that we, exclusive of all others, add these administrative and legislative functions to our duties. We are courting tragedy in the decision-making process, our sole obligation under § 146. Will we have open meetings? Will we invite the press and public to our discussions of any proposed rules? Clearly they are entitled to be present, because this is legislating, not deciding cases. See: Page, 3 Miss.Coll. L.Rev. 32, footnote 191; In re "Sunshine Law", 1976 PA 267, 400 Mich. 660, 255 N.W.2d 635 (1977)
7. There is a serious ethical question as well. Its subtlety should not escape us. In Hosford v. State, 525 So.2d 789, 798 (Miss. 1988), we stated the danger of a court asserting its "inherent power" when the court was the interested party. Not only should there be no partiality, but indeed no appearance of it. Yet we alone are deciding rules in which we have a direct interest. Will we opt for our own convenience, our own ease, even though litigants could suffer? And, as I have noted, there is no appeal, there is no recourse.
In fact, this case demonstrates our eagerness to assert this power. The question of violation of inherent powers was not raised by the parties. We called upon them to address it.
8. I was about to call the majority's action a coup d'etat of the Legislative Branch's Constitutional power to enact statutes on practice. That, however, is too mild. It is more a coup de grace. The majority emasculates plain words. The Constitution clearly envisions the authority in the Legislature to enact statutes on practice in courts. And, as above tediously set forth, the Legislature would have this power without a specific grant, because the Constitution does not prohibit it. We have no such specific grant of authority. To take from the Legislature a specific Constitutional grant of authority, long recognized and scrupulously honored by our predecessors on this Court, and implant one in ourselves where it is not specifically granted will cause the thinking citizen to wonder about our integrity. We read even the plainest of words as we please.
We tell the people that they cannot  through the only voice they have to enact laws, the Legislature  enact any statute providing for evidence in this most serious and insidious of crimes, even though it may be fair and violate no Constitutional safeguard of an accused. Instead, we will have some non-elected committee look at it, and by and by, if we choose to, we may adopt it as a rule on our own.
Instead of consigning it to a footnote (footnote 13, majority opinion, p. 1344) with the observation that we have already passed this hurdle, the majority would have served the law well by grappling with the troubling questions raised by Page, Constitutionalism and Judicial Rule-making, 3 Miss.Coll.L.Rev. 1. This article, and especially the response by Herbert in the same issue, p. 45, should be required reading for any student of this question. Kay, The Rule-Making Authority and Separation of Powers in Connecticut, 8 Conn.L.Rev. 1 (1975), should likewise be required reading. These treatises expose the fallacy of the majority's holding.

CONCLUSION
As I first noted, I was one of the members of this Court named in a Senate Bill to be removed from office for voting for adoption of MRCP in 1981. Had I had any inkling then that this Court would some day assert the power the majority does now, I would have saved them the trouble of a hearing. I would have walked over and pleaded guilty.
Justice Bowling, in his objection to our Order, made some prescient observations:
[T]his Court has no power to repeal statutes, unless for constitutional reasons. The present action will result in chaos.
* * * * * *
I reluctantly predict that when the people of this state come to realize what has *1366 been done to them, they will rise up and demand that the courts be returned to them, the people, who pay the bill.
Order of the Supreme Court, May 26, 1981. Miss.Cases, So.2d Vol. 395-397, Court Rules, Bowling, J., dissenting.
Hobbes, I am told, made the statement, "Hell is learning the truth too late."
NOTES
[1] Admissibility of opinion testimony (a) that a child exhibits the characteristics of a sexually abused child and (b) that the child is telling the truth are hotly disputed legal issues we find it unnecessary to address or decide today. Cf. House v. State, 445 So.2d 815, 822 (Miss. 1984).
[2] Graham holds a bachelor's degree in sociology and has nine years experience as a social worker associated with the Hinds County Department of Public Welfare. Her principal experience is in the area of child sexual abuse problems.
[3] Chance holds a master's degree in clinical social work and works as a child therapist in a clinical setting, with psychiatrists and psychologists. She has been associated with the Hinds County DPW, the Jackson Mental Health Center, and is now in private practice.
[4] For reasons which will become apparent below, we find it unnecessary to consider or decide whether admission of this hearsay evidence violated rights secured to Hall (a) by Article 3, Section 26 of the Mississippi Constitution of 1890 or (b) by the Sixth and Fourteenth Amendments to the Constitution of the United States.
[5] Rule 803(2), Miss.R.Ev., reads:

(2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.
[6] Rule 803(3), Miss.R.Ev., reads:

(3) Then Existing Mental, Emotional, or Physical Condition. A statement of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.
[7] Rule 803(4) reads:

(4) Statements for Purposes of Medical Diagnosis or Treatment. Statements made for medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment. The official comment to Rule 803(4) reads:
(4) Statements for Purposes of Medical Diagnosis or Treatment. Rule 803(4) represents a deviation from previous Mississippi practice in three significant ways. First, Rule 803(4) permits statements of past symptoms as well as present symptoms. Second, the rule allows for statements which relate to the source or cause of the medical problem whereas Mississippi courts formerly disallowed such statements. See Field v. State, 57 Miss. 474 (1879) and Mississippi Cent. R.R. Co. v. Turnage, 95 Miss. 854, 49 So. 840 (1909), for prerule Mississippi law. While statements about cause are permissible, statements concerning fault are still excludable. Third, the statements may be made either to a physician or to diagnostic medical personnel. Mississippi's pre-rule practice distinguished between narrative statements made to a treating physician and those made to an examining physician who was retained for use as an expert witness in the litigation. Statements made to the former were generally admissible, whereas no statements made to the latter were admissible. See Mississippi Cent. R.R. Co. v. Turnage, 95 Miss. 854, 49 So. 840 (1909). Rule 803(4) eliminates that distinction and permits statements made both for treating and diagnostic purposes. Under Rule 803(4) the statement need not be made to a physician. This is consistent with traditional Mississippi practice.
[8] We are aware that some courts have played fast and loose with rules worded as our Rule 803(4) and have allowed the hearsay statements of child abuse victims to be admitted through the testimony of mental health professionals under the purported authority of that rule. United States v. Renville, 779 F.2d 430, 436-37 (8th Cir.1985); State v. Nelson, 138 Wis.2d 418, 406 N.W.2d 385, 390-91 (1987). We find such efforts disingenuous and resist the temptation to elasticize our Rule 803(4) hearsay exception beyond the diagnosis and treatment of matters medical. Cassidy v. State, 536 A.2d at 678-89. (noting in the context of child sexual abuse that the exception is being stretched "beyond its breaking point."); J. Weinstein & M. Berger, Evidence § 803(4)[1] (1984); C. McCormick, Law of Evidence at 840 n. 8 (3d ed. 1984). Whether Rule 803(4) should be amended to include such evidence is a matter that ought first be considered by the Advisory Committee on Rules. See Part III(E) below.
[9] Rule 803(24) reads:

(24) Other Exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.
The official comment to Rule 803(24) reads:
(24) Other Exception. The rule reflects the realization that the law is not stagnant. As the FRE Advisory Committee's Note indicates, it would be presumptuous to assume that the contemporary legal community has enumerated every single hearsay exception which possibly could exist. The exceptions are not a closed system, and Rule 803(24) and its counterpart Rule 804(b)(5) allow for the future development of the law when the guarantees of reliability and trustworthiness can be found. While these two rules allow for judicial discretion, they do not permit an unfettered discretion which could ultimately devour the hearsay rule. One of the clearest examples of the circumstances meeting the criteria of rule 803(24) is found in Dallas County v. Commercial Union Assur. Co., 286 F.2d 388 (5th Cir.1961).
[10] The definition in its entirety reads:

Rule 804. Hearsay Exceptions; Declarant Unavailable
(a) Definition of Unavailability. "Unavailability as a witness" includes situations in which the declarant:
(1) Is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement; or
(2) Persists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so; or
(3) Testifies to a lack of memory of the subject matter of his statement; or
(4) Is unable to be present or testify at the hearing because of death or then existing physical or mental illness or infirmity; or
(5) Is absent from the hearing and the proponent of his statement has been unable to procure his attendance (or in the case of a hearsay exception under subdivision (b)(2), (3), or (4), his attendance or testimony) by process or other reasonable means.
A declarant is not unavailable as a witness if his exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of his statement for the purpose of preventing the witness from attending or testifying.
[11] Section 13-1-403 in its entirety reads:

§ 13-1-403. Admissibility of child's out-of-court statements.
(1) An out-of-court statement made by a child under the age of twelve (12) describing any act of child abuse, sexual abuse, or any other offense involving an unlawful sexual act, contact, intrusion or penetration performed in the presence of, with, by or on the declarant child, not otherwise admissible, is admissible in evidence to prove the contents thereof, if:
(a) Such statement is made for the purpose of receiving assistance or advice in order to prevent or mitigate the recurrence of the offenses, or in order to obtain advice about the psychological, social or familial consequences associated with the offenses; and
(b) Such statement is made to a person on whom the child should reasonably be able to rely for assistance, counseling or advice; and
(c) The child either:
(i) Is available to testify; or
(ii) Is unavailable as a witness, provided that there is other corroborative evidence of the abuse or offense. A finding of unavailability except in those situations specified by Rule 804 of the Mississippi Rules of Evidence, shall require a finding by the court, based on the specific behavioral indicators described in § 13-1-411, that the child's participation in the trial would result in a substantial likelihood of traumatic emotional or mental distress; and
(d) The court finds in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient guarantees of trustworthiness. In determining the trustworthiness of the statement, the court may consider the age and maturity of the child, the nature and duration of the abuse or offense alleged, factors which may detract from the declarant's credibility, information provided about the child's reliability based on the specific behavioral indicators described in § 13-1-411, or any other factor deemed appropriate.
(2) The defendant shall be notified no later than ten (10) days before trial that an out-of-court statement as described in this section shall be offered in evidence at trial. The notice shall include a written statement of the content of the child's statement, the time the statement was made, the circumstances surrounding the statement which indicate its reliability and such other particulars as necessary to provide full disclosure of the statement.
(3) The court shall make specific findings of fact, on the record, as to the basis for its ruling under this section.
[12] In Hosford v. State, 525 So.2d 789, 790 n. 1 (Miss. 1988), we acknowledged this as "a question yet to be addressed".
[13] See Page, Constitutionalism and Judicial Rule Making: Lessons From the Crisis in Mississippi, 3 Miss.Coll.L.Rev. 1 (1982); Herbert, Process, Procedure and Constitutionalism: A Response to Professor Page, 3 Miss.Coll.L.Rev. 45 (1982). See also Franck, Practice and Procedure in Mississippi: An Ancient Recipe for Modern Reform, 43 Miss.L.J. 287 (1972).
[14] Less than two months ago we promulgated new Uniform Chancery Court Rules. See Order entered December 14, 1988.
[15] Of lesser significance today, Miss. Const. Art. 6, § 146 (1890, as amended), provides:

The Supreme Court shall have such jurisdiction as properly belongs to a court of appeals and shall exercise no jurisdiction on matters other than those specifically provided by this Constitution or by general law.
See also Miss. Code Ann. § 9-3-9 (Supp. 1988). It goes without saying that this Court seeks to exercise no authority except that within the judicial power.
[16] This power has been recognized in Miss. Code Ann. § 9-3-61 (Supp. 1988). Legislative attempts to limit the rule making power, see, e.g., Miss. Code Ann. § 9-3-71 (Supp. 1988), are, of course, of no force or effect.
[17] For a summary of the judicial development of the hearsay rule in this state, and exceptions to that rule, see Goodman, Hearsay Evidence, published in 23rd Annual Mississippi Law Institute: Evidence 65-134 (1968).
[18] See Order In The Matter of the Adoption of the Mississippi Rules of Evidence, entered November 24, 1985, as reproduced in Mississippi Rules of Court 240-41 (1988).
[19] Particularly articulate spokesmen for a view of judicial rule-making authority in the present context are Vice Chief Justice Stanley G. Feldman of the Arizona Supreme Court, State v. Robinson, 153 Ariz. 191, 735 P.2d 801, 806-08 (1987), and Justice John I. Purtle of the Arkansas Supreme Court, Smart v. State, 297 Ark. 324, 761 S.W.2d 915, 917 (1988) and Cogburn v. State, 292 Ark. 564, 732 S.W.2d 807, 813, 817 (1987) (Purtle, J., concurring).
[20] This is not to say that the judiciary should give the back of its hand to every legislative enactment arguably encroaching upon its rule-making turf. Deference ought to be given such legislative expressions, not out of obligation but comity, not out of accession to authority, but in respect for the legislature as that branch of government closest to the people whom all branches have been created to serve. Where the invasion is minor and where otherwise the legislature has enacted upon a matter well within legislative authority, we may adopt the legislated rule as our own. See Hudspeth v. State Highway Commission of Mississippi, 534 So.2d 210, 213 (Miss. 1988). For when all is said and done, law is not an end, but a means to the end of a society in which we should all want to live, and legislatures are one structure democratic theory has devised for identifying the shape of that popularly desired society.

For example, Miss. Code Ann. §§ 13-1-261, et seq. (1972) sets forth a procedure for examining a judgment debtor. That statute enjoys legal validity, however, not because it has been enacted by the legislature but because this Court has declared in Rule 69(b), Miss.R.Civ.P., that a judgment creditor may proceed "as provided by statute." H & W Transfer and Cartage Service, Inc. v. Griffin, 511 So.2d 895, 900 (Miss. 1987). See also First Mississippi National Bank v. KLH Industries, Inc., 457 So.2d 1333, 1337-38 (Miss. 1984) (garnishment statutes remain enforceable by virtue of Rule 69(a), Miss.R.Civ.P. Quite arguably the Mississippi Uniform Post-Conviction Collateral Relief Act, codified as Miss. Code Ann. §§ 99-39-1, et seq. (Supp. 1988) invades our rule-making power  indeed, Section 99-39-3 blatantly announces that it "supersedes Rule 8.07 of the Mississippi Uniform Rules of Circuit Court Practice." But see, Reynolds v. State, 521 So.2d 914, 915 (Miss. 1988). The act may be enforced, however, not because of any validity given it but legislative fiat, but because this Court has so provided by rule. See Rule 22, Miss.Sup.Ct.Rules (1988).
Beyond this, there are a wide variety of legislative enactments on points of practice and procedure that we continue to use. See, e.g., Miss. Code Ann. § 11-7-123 (1972) describing a procedure for obtaining a continuance, McFadden v. State, 408 So.2d 476, 478-79 (Miss. 1982); and Miss. Code Ann. § 99-19-101(7) (Supp. 1988) providing certain findings a jury must make before it may impose a death sentence, Pinkton v. State, 481 So.2d 306, 309 (Miss. 1985). And we will continue to use such rules, though we did not think of them, subject always to our responsibility when appropriate to exercise the judicial rule-making power.
[21] See, e.g., McCord, Expert Psychological Testimony About Child Complaints In Sexual Abuse Prosecutions, 77 J. of Crim.Law & Criminology 1 (1986); Cohen, The Unreliability of Expert Testimony on the Typical Characteristics of Sexual Abuse Victims, 74 Geo.L.J. 429 (1985); Graham, The Confrontation Clause, the Hearsay Rule, and Child Sexual Abuse Prosecution: The State of the Relationship, 72 Minn.L.Rev. 523 (1988); Serrato, Note: Expert Testimony in Child Sexual Abuse Prosecutions: A Spectrum of Uses 66 B.U.L.Rev. 155 (1988); Lacayo, "Sexual Abuse or Abuse of Justice?", Time, May 11, 1987, at 49; Kelly, Comment: Legislative Responses to Child Sexual Abuse Cases: The Hearsay Exception and the Videotape Deposition, 34 Cath.U.L. Rev. 1021 (1985); "Studies Find Sexual Abuse of Child is Widespread", New York Times, May 13, 1982, at C1, Col. 1; "Child Sexual Abuse: What Your Children Should Know" (PBS, Sept. 1984); "The Sexual Abuse of Children" (NBC-TV, Aug. 25, 1984); The Testimony of Child Victims in Sex Abuse Prosecution: Two Legislative Innovations, 98 Harv.L.Rev. 806 (1985).
[22] The Advisory Committee on Rules was created by Order of this Court entered November 9, 1983. Its membership includes a broad cross-section of the bench, bar and academia. It is not to be confused with the now defunct Advisory Committee on Rules of Civil Practice and Procedure. See Miss. Code Ann. § 9-3-65 (Supp. 1988).
[23] See notes 1, 4 and 8, supra. Following any such recommendation, our customary procedure requires that we publish any such proposed rule changes and accept public comment before taking final action. The course we followed in Hudspeth is the exception, and not the rule.
[24] When, after considering the outcome determinative issue, we go forward and "decide" issues likely to recur on retrial, we are, in effect, advising the trial court, "if, upon the new trial, the evidence and procedural posture are substantially the same as at the first trial, then you should decide the issue as we here advise." But this does not change the fact that the new trial is a trial de novo in every sense of the word. Johnson v. State, 529 So.2d 577, 579 (Miss. 1988); West v. State, 519 So.2d 418, 425 (Miss. 1988). See, e.g., Gibson v. State, 503 So.2d 230 (Miss. 1987). On Gibson's first appeal, we reversed Gibson v. State, 458 So.2d 1046 (Miss. 1984), holding that the prosecution had failed to lay a proper foundation for introduction of the results of a blood alcohol test. The incident at issue had occurred on September 19, 1981. Authorities had used a blood collection kit marked with an expiration date of December, 1980. This fact was not explained. At Gibson's new trial all began anew and the prosecution satisfactorily explained "that the expired kit's contents had no effect on the results of the blood test." Gibson II, 503 So.2d at 232. See generally Weems v. American Security Insurance Co., 486 So.2d 1222, 1226 (Miss. 1986) (when Supreme Court reverses and remands for a new trial, the case is to be tried de novo on all issues); Miller v. Watson, 467 So.2d 672, 674 (Miss. 1985) (same).
[1] It was my coming on this Court which gave a majority to the assertion of this Court's rule-making power in adopting the Mississippi Rules of Civil Procedure in 1981. (Order of the Supreme Court, May 26, 1981, Miss.Cases, So.2d Vol. 395-397, Court Rules, Roy Noble Lee, J., dissenting, when MRCP adopted.) Until I came on the Court, there was not a majority of the membership in favor of the Court adopting the rules. Also, I am the only remaining member of this Court who bears the scars of voting for adoption of the Rules. A bill was introduced in the Senate to remove those of us who voted to adopt them. Article 4, § 53 Constitution.
[2] The remainder of § 146 now reads:

The Legislature may by general law provide for the Supreme Court to have original and appellate jurisdiction as to any appeal directly from an administrative agency charged by law with the responsibility for approval or disapproval of rates sought to be charged the public by any public utility. "The Supreme Court shall consider cases and proceedings for modification of public utility rates in an expeditious manner regardless of their position on the court docket."
This amendment presents a modest case of logrolling. Thanks, however, to Burrell v. State Tax Commission, 536 So.2d 848 we have sanctioned logrolling in the first degree.
[3] Franck, Practice and Procedure in Mississippi: An Ancient Recipe for Modern Reform, 43 Miss. L.J. 287, 292 (1972).
[4] The majority also ignores Art. III, § 31, and Art. VI, § 163, specifically giving the Legislature procedural jurisdiction as to less than unanimous jury verdicts, and transfer of cause from chancery to circuit court, or vice versa, and reformation of pleadings upon such transfer.
[5] Indeed, Napoleon made such a claim. He told his parliament to stay out of the executive part of government, he would handle that. We do not have such a form of government, and the majority's thinking is too similar to Bonaparte's for comfort.
[6] Even Wigmore has become skeptical. "... it is no longer fashionable or intellectually respectable to talk about `inherent' judicial functions or authority." Wigmore, supra, § 7, footnote 1, p. 474.
[7] SAY
A statute is clearly a law.
"But it must be a `valid law,'" we say.
And, why is not a duly-enacted statute a "valid" law?
"Because we say it is not, that is why."
Well, what makes it invalid?
"Because we say so."
And, why do "we" say so?
"Because the Legislature had no legal authority to pass the law."
Why did the Legislature not have this authority?
"Because we say so."
And, why do "we" say so?
"Because we have the `inherent authority' to say so."
And why do "we" have this "inherent" authority?
"Because we say so."
[8] In the 1920s there was a powerful reform movement seeking to transfer the rule-making power to the courts, supported by the American Bar Association under the guidance of Roscoe Pound. The arguments for this change were based not upon constitutional theory, but upon considerations of public policy, and addressed either to the legislature, where the power was assumed to reside, or to amending state constitutions. It was assumed either statutory enabling acts, or constitutional amendment was necessary.

These efforts were quite successful. The vast majority of states either enacted legislation authorizing their courts to promulgate rules, or such authority has been given by amendments to state constitutions. See: Kay, The Rule-Making Authority and Separation of Powers in Connecticut, 8 Conn.L.Rev. 1, p. 28 (1975).
No such statutory authority or constitutional amendment exists in Mississippi.
[9] Triplett, Hocus Pocus Legal Procedure, 16 Miss. L.J. 9 (1943); Fant, Procedural Reform in Mississippi, 34 Miss.L.J. 40 (1963); Ethridge, Improving the Machine of Justice, 37 Miss.L.J. 506 (1966); Patterson and Patterson, A Plea for Procedural Reform in Mississippi, 43 Miss.L.J. 293 (1971). Speeches were made to young lawyers; I recall one such in 1951 by the Honorable Hugh N. Clayton of the New Albany bar.
[10] Likewise, Justice Roy Noble Lee said as much in his dissent to our adoption of MRCP. See, Order of the Supreme Court, May 26, 1981, Miss.Cases, So.2d Vol. 395-397, Court Rules, Roy Noble Lee, J., dissenting, when MRCP adopted.
[11] Before anyone starts censuring the Legislature for this impasse, I respectfully remind my colleagues that the Legislative branch should not be blamed for the rejection. There was no opposition to the proposed rules from the lay members. The proposed rules were disapproved because lawyers and judges, the "specialists," the ones with "expertise," disagreed between ourselves. It was these "specialists" who did the whooping and hollering. And the Judiciary Committee was dominated by lawyers.
[12] One notable exception was the Dead Man's Statute, Miss. Code Ann. § 13-1-7. Here again, Rule 601 declares every person is competent to be a witness "except as restricted by Miss. Code Ann. §§ 13-1-5 and 13-1-11, or by these rules," envisioning, as does Rule 802, a partnership in the rule-making process between the courts and the legislature.
[13] This Harvard Law Review note begins with the following sentence: "One in five females and one in eleven males are sexually abused as children."
[14] Alaska  § 12.40.110; Arkansas  Rule 803(25)(a); California  Cal.Penal Code § 288, Ev.C. § 1228, § 1346; Colorado  § 13-25-129, § 18-3-411(3); Florida  Stat. § 90.403, § 918.17; Georgia  OCGA § 24-3-16; Hawaii  Rule 616; Indiana  IC XX-XX-X-X; Iowa  § 232.96(6); Kansas  KSA 60-460(dd); Kentucky  § 421.350, § 421.355; Louisiana  LSA-R.S. 15:440.1  15:440.6; Maine  Me. Rev. Stat. Ann. Title 15 § 1205; Minnesota  Minn. Laws 595.02(3); Missouri  § 491.075, § 492.304; Montana  Mont. Code Ann. § 46-15-401, § 46-15-403; New Mexico  N.M.R. Cr.P.R. 29.1 (based on N.M. Stat. Ann. § 30-9-17); North Carolina  Rule 803(24); Oklahoma  § 2803.1; South Dakota  S.D. Codified Laws Ann. § 19-16-38; Tennessee  § 24-7-116; Texas  Tex. Code Crim. Proc.Ann. Art. 38.072; Utah  Utah Code Ann. § 76-5-411; Washington  R.C.W. 9A.44.020; Wisconsin  Wis. Stat. § 967.04(7).
[15] The only contrary view I have found is State v. Robinson, 153 Ariz. 191, 735 P.2d 801 (1987). The Arizona Supreme Court, which has specific Constitutional grant of authority to make procedural rules, Art. 6, § 5, Ariz. Const., held a child abuse statute unconstitutionally infringed upon its rule-making power. As I have shown, this is a decidedly minority view, and at least that Court had some express constitutional authority for its holding. With its astonishing intrepidity in inverting logic, the majority cites this case as authority for our claim to exclusivity (footnote 19, p. 1346, majority opinion), without seeing fit to mention that the Arizona Constitution specifically grants rule-making authority to the Supreme Court; our Constitution clearly does not. You can prove anything if you take the liberty of picking and choosing your facts.
[16] Moreover, as Justice G. Ethridge wrote many years ago: "The judges have no power to pass on the constitutionality of an act of the legislature until some citizen has called upon it to decide a right of such citizen that has been violated by such law." Page, 3 Miss.Coll.L.Rev., 34, quoting Ethridge, Mississippi Constitutions 27-28 (1928).
[17] The majority's effrontery becomes apparent when one considers that at least once a week the Legislature must pass upon statutes of far greater depth and complexity than the hearsay rule will ever be; e.g., Open Meetings laws, controlled substances laws, tax taws, to name a few.
[18] State v. Clemente, 166 Conn. 501, 353 A.2d 723 (1974), affords an example of precisely the reverse effect from this claim of exclusivity. The Connecticut legislature passed a statute giving the accused the right to examine prior written statements of a state's witness after he had testified in court. Because the accused had no such right under the rules theretofore adopted by the Connecticut court, the court held the statute unconstitutional. This prompted Kay, The Rule-Making Authority and Separation of Powers inn Connecticut, 8 Conn.L.R. 1 (1975).